PAN–AMERICAN TRADING CO. v. FRANQUIZ.

(District Court, S. D. Florida. October 31, 1925.)

1. Stipulations ⊂⊃18(3)—Filing of answer containing exceptions to libel held permissible, in view of stipulation.

Filing of amended answer containing exceptions to libel held permissible, in view of stipulation that respondent could "file such amended answer or other pleading" as he might be advised, notwithstanding general rule that exceptions to libel should be filed before answer.

2. Admiralty ⊂⊃34—Question of laches determined from facts and circumstances in each case.

Question of laches is to be determined from facts and circumstances surrounding each case, and neither statutes of limitation nor lapse of time is controlling.

3. Admiralty ⊂⊃34—Mere lapse of time, without change in status of parties or accrual of intervening rights, will not bar claim.

Where there is no change in status of parties, and no intervening rights have accrued, a mere lapse of time is not sufficient ground to justify court of admiralty in declaring claim stale and denying libelant right to enforce it.

4. Admiralty ⊂⊃34—Libel for breach of contract of affreightment held not barred by laches.

Libel in personam for breach of contract of affreightment, brought within 5 years after right accrued, held not barred by laches.

5. Shipping ⊂⊃42—Owner entering into charter party containing warranty of seaworthiness not excused by fact that defect is latent and unknown.

Owner of vessel, entering into a charter party containing warranty that vessel shall be tight, staunch, strong, and in every way fitted for voyage, is bound to see that vessel is seaworthy, and not excused by fact that defect is latent and unknown.

6. Shipping ⊂⊃208—Harter Act does not relieve owner from liability on expressed warranty of seaworthiness contained in charter party.

Owner, entering into charter party containing warranty of seaworthiness, is not relieved from liability for unseaworthiness by Harter Act (Comp. St. §§ 8029–8035), though he has used due diligence in inspecting vessel.

7. Shipping ⊂⊃58(2)—Evidence held to show unseaworthiness of vessel at time she broke ground.

Evidence held to show unseaworthiness of vessel at time she broke ground for voyage.

8. Shipping ⊂⊃132(3)—Respondent in libel for loss of cargo has burden of proving that it was due to perils of sea.

In libel for breach of contract of affreightment in failing to deliver cargo, respondent has burden of proving that loss was due to perils of sea.

9. Shipping ⊂⊃132,(5)—Evidence held insufficient to show that loss of cargo was due to perils of sea, rather than established unseaworthiness.

Evidence held insufficient to show that loss of cargo was due to perils of sea, rather than established unseaworthiness of vessel.

In Admiralty. Libel in personam by the Pan-American Trading Company against Jose Franquiz. Decree for libelant.

Bigham, Englar & Jones, of New York City, and E. J. L'Engle and W. F. Rogers, both of Jacksonville, Fla., for libelant.

Hampton, Bull & Pencke, of Tampa, Fla., for respondent.

JONES, District Judge. This is a libel in personam, based upon a breach of a contract of affreightment made and entered into between Pan-American Trading Company, a corporation, libelant, and Jose Franquiz, respondent. After the respondent had filed his answer, a stipulation was entered into between the proctors for libelant and respondent, agreeing to an order allowing respondent a given time in which to file "such amended answer or other pleading therein as he may be advised," and an order to this effect was duly entered, and within the time specified in the order respondent filed an amended answer, embodying in such amended answer certain exceptions to the libel. Libelant has filed a motion to strike these exceptions upon the grounds that under the rules exceptions to a libel should be filed before answer is made and by filing the original answer respondent waived his right to file exceptions.

[1] An order of reference to take the testimony was duly made, and the cause comes on to be heard upon final hearing, subject to the exceptions of respondent to the libel and the motion of libelant to strike said exceptions upon the grounds hereinbefore stated. The stipulation entered into between the proctors in this case and the order based thereon allowed the respondent "to file such amended answer or other pleading" in the case as he might be advised. I think this order, based upon an agreement of proctors for the libelant, clearly permitted respondent to file these exceptions, and therefore the motion of libelant to strike the exceptions to the libel will be denied.

Before going into the merits of this case, it will be necessary, of course, to first pass upon the exceptions to the libel. The grounds of these exceptions are:

"(1) It appears that the libelant ought not to have the relief for which he prays. * * *"

"(2) It appears in and by said libel and the allegations therein that the libelant has been guilty of gross laches in bringing said proceeding. * * *"

"(3) Said libel shows on its face that the vessel described therein left the port of embarkation in a seaworthy condition."

The first exception is in the nature of a general demurrer and attacks the form of the libel. This libel is in the usual form, and in my opinion contains all the necessary allegations to state a cause of action, and this exception is not well taken.

The second exception is based upon the grounds of laches. The libel alleges that the cargo (the failure to deliver which is the basis of this action) was delivered aboard the vessel John Francis in St. Andrews Bay, Fla., on or about May 17, 1919, for delivery in Arecibo, Porto Rico, and that said cargo was never delivered. This libel was filed January 17, 1924, less than five years after the alleged breach of the contract for carriage.

[2] The question of laches is a difficult one, for the reason that no hard and fast rule can be laid down by which to determine whether or not a claim is stale. This question has been considered by the courts in many cases, and various decisions rendered. The consensus of opinion and the rule as laid down by the courts of the United States are to the effect that the question of laches is to be determined from the facts and circumstances surrounding each separate case; that state statutes of limitations are not binding and lapse of time is not necessarily controlling. Statutes of limitations are, however, sometimes followed by analogy. See The Key City, 14 Wall. 653, 20 L. Ed. 896; Harwood v. C. & C. A. L. R. R. Co., 17 Wall. 78, 21 L. Ed. 558; Foster's Federal Practice (6th Ed.) par. 576; Lincoln v. Cunard S. S. Co., 221 F. 622, 137 C. C. A. 346; Pacific Coast S. S. Co. v. Bancroft-Whitney Co., 94 F. 180, 36 C. C. A. 135; Fill v. Cunard S. S. Co. (D. C.) 217 F. 84; The Alabama, 242 F. 431, 155 C. C. A. 207.

[3] In considering the facts and circumstances surrounding a particular case, the rule seems to be fairly well settled that, where there has been no change in the status of the parties and no intervening rights accrued, a mere lapse of time is not sufficient grounds to justify a court of admiralty in holding a claim stale and denying the libelant the right to enforce his rights. Pacific Coast S. S. Co. v. Bancroft-Whitney Co., supra; Bailey v. Sundberg, 49 F. 583, 1 C. C. A. 387; The Martino Cilento (D. C.) 22 F. 859; Coburn v. F. & T. Ins. Co. (C. C.) 20 F. 644.

[4] The facts in the instant case do not show any change in the status of the parties, or intervening rights of any kind that would be affected by the delay in bringing this suit. The action is based upon the breach of a written instrument and the statute of limitations in the state of Florida

in connection with such actions is five years, and this suit was brought within this period. I do not see anything in the facts connected with this case that would justify this court in sustaining the exception to the libel upon the ground of laches.

The third ground of the exceptions—that it appears on the face of the libel the vessel left the port of embarkation in a seaworthy condition—is not well taken, as I find nothing in the libel to this effect. The exceptions will therefore be overruled.

This libel alleges, and the amended answer admits, that the respondent was the owner of the schooner John Francis; that he undertook, in consideration of the freight money paid to him by the libelant, to carry a cargo of lumber, the property of the libelant, from St. Andrews Bay, Fla., to Arecibo, Porto Rico; that the cargo of lumber was in good order and placed aboard the vessel; that the respondent acknowledged receipt thereof by delivering a bill of lading to the libelant, wherein it was agreed that delivery should be made as stated above; that a charter party had been previously entered into covering said voyage; that the respondent received in advance the entire stipulated freight for the voyage, and that said cargo was never delivered at Arecibo, Porto Rico.

The amended answer then proceeds in paragraph 4 thereof to deny all liability, upon the ground that the failure to deliver the cargo in accordance with the contract was due to a "peril of the seas," an excepted cause in both the charter party and the bill of lading, and said failure was in no way due to any negligence upon the part of the respondent, or any of the officers or agents of said vessel.

This paragraph in the answer sets out that the respondent purchased the vessel John Francis while she was upon the high seas and after the charter party of the libelant had already been entered into; that the respondent had never seen the vessel at the time of purchase, nor had he seen her at the time of loading and of sailing from St. Andrews Bay, Fla., with this cargo; that he caused the vessel to be thoroughly inspected by competent persons at St. Andrews Bay, Fla., to ascertain if she was suitable for the proposed voyage, and alleges that the result of said inspection was "that said vessel was pronounced and certified to be seaworthy in every way"; that after the vessel left port, and was proceeding on her voyage in a prudent manner, "she suffered a misfortune due to a peril of the sea, in that the

power pump upon said vessel, due to a latent and hidden defect unknown to this respondent or persons in charge of said vessel at the time of embarking on said charter party, became out of commission and would not work, and near the entrance of Northwest Channel of Tampa Bay, while said vessel was under the command of a pilot whom this respondent was required by law to employ, and which said pilot was then and there a member of the Pilots' Association of the Port and Harbor of Tampa, a certain pin, the attachment of which held the rudder in place, and which before that time had given no external evidence of being out of order or repair, which lack of repair was unknown to the persons operating said ship, broke, and became unshipped by means whereof, through no fault or negligence on the part of the pilot in charge of said vessel, the same by reason of said extraordinary circumstances was inevitably carried by wind and tide into shoal waters; that owing to the strong wind prevailing at said time, and proximity of said vessel to said shoals at said time and place, it was impossible for the employees of this respondent in charge of said vessel to repair said rudder, or control the vessel, so that on or about May 31st, in the afternoon, by reason of striking the bar at said time and place, the vessel became damaged so badly that she had about seven feet of water in her hold, and fell over on one side, in consequence of which she then and there became wrecked and was a total loss."

It is the contention of the libelant that the vessel was unseaworthy at the time she broke ground for this voyage, for the reason that she was leaking badly; that the power pump on said vessel was defective at that time, as was also the rudder; and that the failure to deliver the cargo in accordance with the contract was due to unseaworthiness of the vessel, and not to any "peril of the sea," as contended by the respondent. The questions, therefore, to be determined are: (1) Was the vessel unseaworthy at the time she undertook this voyage? (2) If so, was the failure to deliver the cargo due to this condition, or was said failure due to or brought about by a "peril of the sea"?

[5] In my judgment the law governing this case is quite plain. Where an owner enters into a charter party containing a warranty (as is the case here) that the vessel shall be "tight, staunch, strong, and in every way fitted for the voyage," he is bound to see that the vessel is seaworthy,

and is not excused by the fact that the defect is latent and unknown to him.

"When it is agreed by a charter party, on the part of the vessel, that she shall be tight, staunch, strong, and in every way fitted for the voyage, the owner is bound to see that the vessel is seaworthy and suitable for the service on which she is to be employed, and he is not excused by the fact that a defect is latent and unknown to him; but no obligation in that respect rests upon the owner of the cargo." The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688.

"There can be no question but that it is the duty of the shipowner to provide a ship which is fit and competent for the cargo and the particular service for which she is engaged. The carrier either expressly or impliedly warrants the seaworthiness of the vessel at the commencement of the voyage. * * * And this warranty that the vessel is fit at the beginning of the voyage is an absolute undertaking, which is not dependent on the owner's knowledge or ignorance that the ship is in fit condition to undergo the perils of the sea." The Benner Line v. Pendleton, 217 F. 497, 133 C. C. A. 349.

"The shipowner's undertaking is not merely that he will do and has done his best to make the ship fit, but that the ship is really fit to undergo the perils of the sea and other incidental risks to which she must be exposed in the course of the voyage; and, this being so, that undertaking is not discharged because the want of fitness is the result of latent defects." The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed, 644.

"Further, it has frequently been decided by this court that in every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy at the time of beginning her voyage, or that he has used his best efforts to make her seaworthy, and that his undertaking is not discharged because the want of fitness is the result of latent defects." The Irrawaddy, 171 U. S. 187, 18 S. Ct. 831, 43 L. Ed. 130.

"The burden was upon the owner to show by making proper and reasonable tests that the vessel was seaworthy and in a fit condition to receive and transport the cargo undertaken to be carried, and if by the failure to adopt such tests and to furnish such proofs the question of the ship's efficiency is left in doubt, that doubt must be re-

solved against the shipowner and in favor of the shipper. In other words, the vessel owner has not sustained the burden cast upon him to establish the fact that he has used due diligence to furnish a seaworthy vessel, and, between him and the shipper, must bear the loss. The Edwin I. Morrison, 153 U. S. 199, 215 [14 S. Ct. 823, 38 L. Ed. 688]; The Phoenicia [D. C.] 90 F. 116." The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65.

It was therefore unquestionably the duty of the owner to furnish a vessel that was seaworthy, and, if there were any latent defects which rendered her unseaworthy, the fact that they were latent and unknown in no way relieves him of this duty.

[6] The respondent contends that he used due diligence in inspecting this vessel before leaving on this voyage, to ascertain if she were seaworthy, and, finding no evidence as a result of this inspection of unseaworthiness, he is relieved from liability under the provisions of the Act of Congress of February 13, 1893, c. 105, 27 Stat. 445 (Comp. Stat. §§ 8029–8035), known as the Harter Act. In my opinion, there being in this case a charter party covering the entire capacity of the vessel, the Harter Act would not apply.

"The provision of section 2 of the Harter Act * * * making it unlawful for the owner of a ship 'to insert in any bill of lading or shipping document any covenant or agreement * * * whereby the obligations of the master, officers, agents or servants to carefully handle and stow her cargo, and to care for and properly deliver the same shall in any wise be lessened, weakened, or avoided,' relates to contracts between carrier and shipper, and does not apply to a charter party by which a ship is demised." The Golcar (D. C.) 146 F. 563.

"When a charter party gives to the charterer the full capacity of the ship, the owner is not a common carrier, but a bailee to transport as a private carrier for hire, and a condition in such a contract, to which the Harter Act * * * has no application, exempting the shipowner from liability on account of the carelessness of its employees, is not contrary to public policy." The Fri, 154 F. 333, 83 C. C. A. 205.

See, also, The Maine (D. C.) 161 F. 401; 36 Cyc. p. 291.

Even if the Harter Act should be applicable to the instant case, it would not be a defense against unseaworthiness of the vessel, for the reason there is no provision in the Harter Act which would relieve against

a breach of the expressed warranty of seaworthiness.

"The provision in that act [Harter Act] exempting owners or charterers from loss resulting from 'faults or errors in navigation or in the management of the vessel,' and from certain other designated causes, in no way implies that because the owner is thus exempted when he has been duly diligent, the law has thereby also relieved him from the duty of furnishing a seaworthy vessel." The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181.

The court, in discussing the Harter Act in The Carib Prince, supra, explains in detail why, even though due diligence is used by the owner, this act does not exempt him from his contract to furnish a seaworthy vessel. The court says:

"The exemption of the owners or charterers from loss resulting from 'faults or errors in navigation or in the management of the vessel,' and for certain other designated causes, in no way implies that because the owner is thus exempted when he has been duly diligent that thereby the law has also relieved him from the duty of furnishing a seaworthy vessel. The immunity from risks of a described character, when due diligence has been used, cannot be so extended as to cause the statute to say that the owner when he has been duly diligent is not only exempted in accordance with the tenor of the statute from the limited and designated risks which are named therein, but is also relieved, as respects every claim of every other description, from the duty of furnishing a seaworthy ship."

[7] Let us now examine the facts as shown by the testimony in this case, and determine whether or not this vessel was in fact seaworthy, as the authorities cited above hold she should be. The testimony shows that this vessel at the time of undertaking this voyage had just returned from a four months' voyage to Santo Domingo; that before loading the cargo here in question in St. Andrews Bay, Fla., the captain engaged two ship carpenters to go over the vessel and determine her condition. These ship carpenters examined the outside of the vessel, so the captain testifies, but did not go into the hold. They found a defective chain plate on one side of the vessel, and replaced it and caulked a few of the seams. The master says the pumps were working in good order, and the rudder was also in apparent good working condition; but there is no testimony to show that any particular tests or detailed examinations were made of either the pumps or the rudder. The master testifies that the vessel was leaking some before leaving port, but not to any great extent, while the mate testifies that, at the time of and before the commencement of the voyage, the vessel leaked about four inches per hour, requiring pumping four times a day for one hour and a half each time.

The master's testimony shows that about 24 hours after leaving port the vessel began to leak, requiring considerable pumping; that he encountered "squalls," during which time she leaked very badly, and she would also leak when he attempted to force her speed, necessitating the reefing of his sails to retard her speed and prevent her leaking excessively. He further testifies that during these conditions the pump broke, due to some trouble with the piston rings, and he then decided to deviate from his course and take his vessel to Tampa to repair these pumps. He arrived off the entrance to Tampa Bay on May 31, 1919; there he took aboard a bar pilot, and while entering Tampa Bay, and after having made one tack, certain screws that held the rudder band dropped out, causing the band to drop down, which jammed the rudder, making it impossible to manipulate the rudder and control the direction of the vessel. She drifted, being out of control, went ashore on a sand bank, and her crew, after several attempts had been made to pull her off, abandoned her and the cargo, considering the vessel a total loss. Subsequently the vessel was pulled off the bank, was taken into the port of Tampa, and the vessel and cargo sold.

In describing these squalls and the weather encountered, the master testifies the highest wind encountered was after she was aground at Eggmont Key, and that the wind at that time reached a maximum of about 25 miles an hour; that at the time the vessel began leaking, during the squalls, the wind reached a velocity not to exceed 20 miles per hour; that there was considerable roll to the sea, but the water did not at any time wash over his decks.

The mate in his testimony says the weather during the voyage was not bad, having replied to the question, "You had good weather all the way down from St. Andrews?" "Yes, sir; good weather all the way down."

The respondent in his answer admits that the pumps became out of commission, "due to a latent and hidden defect, unknown to this respondent or to the persons in charge of said vessel at the time of embarking on said charter party," and that "a certain pin, the attachment of which held the rudder in

place, and which before that time had given no external evidence of being out of order or repair, which lack of repair was unknown to the persons operating said ship, broke, or became unshipped. ʻ ʻ ʻ ʼ ʼ"

Under the authorities cited above, it is clear to my mind that these admissions and the facts stated above show that this vessel was unseaworthy at the time she broke ground for this voyage.

"Where the owner of a vessel charters her, there arises, unless the ʻ contrary be shown, an implied contract on his part that she is seaworthy and suitable for the service in which she is to be employed. He is, therefore, bound, unless prevented by the perils of the sea or unavoidable accidents, to keep her in proper repair, and is not excused for any defects known or unknown. A defect in the vessel, which is developed without any apparent cause, is presumed to have existed when the service began." Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012.

"This sudden breakdown when the vessel was scarcely out of port would raise the presumption of unseaworthiness at the time of the sailing, making it incumbent upon the vessel owner to prove seaworthiness, and this independently of the provisions of the Harter Act (citing Work v. Leathers, 97 U. S. 379 [24 L. Ed. 1012])." The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65.

[8] Having found the vessel unseaworthy, if the unseaworthiness caused the loss, the owner would unquestionably be liable. The respondent contends that the damage and loss claimed in this suit is due to the "perils of the sea," an excepted cause in this charter party. The burden of proof rests upon him to show this.

"After the damage to the goods, therefore, has been established, the burden lies upon the respondents to show that it was occasioned by one of the perils from which they were exempted by the bill of lading, and, even where evidence has been thus given bringing the particular loss or damage within one of the dangers or accidents of the navigation, it is still competent for the shippers to show that it might have been avoided by the exercise of reasonable skill and attention on the part of the persons employed in the conveyance of the goods." Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985.

See, also, The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; Herman v. Compagnie Générale Transatlantique, 242 F. 859, 155 C. C. A. 447.

[9] In my opinion, the respondent has not met this burden, as there is no testimony to show that this vessel was subjected to any "peril of the seas," as contemplated by this exception in the charter party.

"The peril which forms a good exception in a bill of lading means something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety." The Rosalia (C. C. A.) 264 F. 285.

"The term 'perils of the sea,' as used in an exemption clause in a bill of lading, is understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature, or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence." The Giulia, 218 F. 744, 134 C. C. A. 422.

"The phrase 'danger of the seas,' whether understood in its most limited sense as importing only a loss by the natural accidents peculiar to that element, or whether understood in its more extended sense as including inevitable accidents upon that element, must still, in either case, be clearly understood to include only such losses as are of an extraordinary nature, or arise from some irresistible force, or some overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence." The Ninfa (D. C.) 156 F. 512 (adopting definition in The Reeside, 20 Fed. Cas. 458).

Having in mind the foregoing definitions of "perils of the sea," it is patent, from the testimony in this case, no such catastrophic, extraordinary, or irresistible force was encountered by this vessel. The testimony shows the vessel leaked 24 hours after leaving port, and the explanation that this leakage was due to "squalls" of 20 miles an hour velocity is not sufficient to relieve the owner of the burden of proving the loss to have been caused by a "peril of the sea." The pumps failed, due, as admitted in the answer, to latent defects. It is shown that it is customary for vessels to carry parts and paraphernalia to repair such damage. This vessel, in fact, had some additional or extra piston rings, but they were not suited to the pumps in use, and were useless when needed. There is no explanation as to what caused the screws to come out of the rudder band and the band to drop and jam the rudder.

The respondent presented a motion at the final hearing to amend his amended answer in certain respects. The proposed amendments would not, in my opinion, change the proof required in this case, or make any ma-

terial change in the answer. This motion will be denied.

I therefore conclude that the loss in this case was due, not to any "peril of the seas," but to the fact that the owner furnished an unseaworthy vessel, and he is liable for the damage sustained by the shipper.

A decree to this effect will be entered, and an order of reference made to ascertain the amount of the damages.