GAYNER et al. v. THE NEW ORLEANS.
No. 23487.

District Court, N. D. California, S. D.
Jan. 29, 1944.

26

Derby, Sharp, Quinby & Tweedt, of San Francisco, Cal., for libelants.

Heller, Ehrman, White & McAuliffe, of San Francisco, Cal., for respondent and claimant.

GOODMAN, District Judge.

Upon peremptory exceptions to the libel herein, is raised the interesting question as to whether libelants, who were ferry-boat employees of the Southern Pacific Golden Gate Ferries, Ltd. (operator of ferry-boats in the San Francisco Bay) have a maritime lien upon respondent vessel, securing compensation payable under an agreement, for so-called dismissal benefits, entered into by certain labor unions, on behalf of libelants, and Southern Pacific Golden Gate Ferries, Ltd. in August 1936, in contemplation of loss of employment by libelants due to the opening of the San Francisco and Golden Gate Bay Bridges for transbay traffic.

The libel (filed free of costs pursuant to 28 U.S.C.A. 837), as amended by stipulation by the inclusion of the contract above referred to as an exhibit to the libel, alleges that in July of 1936, and thereafter, all of the libelants performed certain services on respondent vessel and other ferry-boats operated by the Southern Pacific Golden Gate Ferries, Ltd. in San Francisco Bay.

Prior to July of 1936, certain labor unions representing libelants, in the belief that the ferry-boat employees of the ferry-boat company would inevitably lose their employment because of diversion of transbay traffic over the San Francisco and Golden Gate bridges then in course of construction, demanded that the ferry-boat · company should provide dismissal benefits in consideration of continued performance of services by the employees. As a result, the agreement attached to the libel and marked exhibit "B" was executed on August 28, 1936, effective as of July 1, 1936. The agreement provided that it "is entered into for the purpose of providing a measure of protection by way of employment and/or compensation" for ferry-boat employees, who, continuing in the employ of the ferry-boat company, are left without positions as a result of either partial or entire abandonment of ferry-boat service due to the divergence of traffic over the two bay bridges when opened for traffic. By the agreement there was set up for those who lost positions due to *partial abandonment,* a schedule of employment of a comparable nature to be provided by the ferry-boat company, in proportion to the length of service of the employee, with the option to the ferry-boat company to pay money compensation in lieu of providing such outside employment. On the other hand, for those employees who lost positions as a result of the *final and complete abandonment* of service, there was provided an option to take other comparable employment or lump sum compensation to be determined according to a formula fixing the amount thereof pursuant to length of employment at the time of cessation of operations.

It is further alleged in the libel that the respondent vessel was "one of a number of vessels comprising a single fleet used by the ferry company in maintaining ferry service as a common carrier to and from San Francisco" and that many such ferry-boats were so required to be used

and that the operation of the respondent vessel in conjunction with the others was essential to maintain commuter service and the schedules of operation requisite in connection therewith; that libelants performed services as officers, deck hands, engineers, oilers, stewards, etc., aboard the respondent vessel and the other vessels of the said so-called "fleet" from June 1, 1937 to and including May 16, 1940, at which time the service was finally abandoned by the ferry company; that some of the libelants were left without positions due to partial abandonment of ferry service prior to May 16, 1940; others were similarly left without positions on May 16, 1940; that some cash benefit payments were made to those who lost their positions due to partial abandonment leaving a balance owing each; that no benefit payments were made to those who lost their positions due to complete abandonment (they having all exercised their option to take cash benefits.) It is further alleged by the libel that the ferry-boat company, having been adjudicated a bankrupt in 1940, its pay-roll records are in the possession of the trustee in bankruptcy and from said records is readily ascertainable the amount of time worked by each of the libelants (212 in number) on board the respondent vessel. The libel further sets forth that the respondent vessel was sold by the Southern Pacific Golden Gate Ferries, Inc. in 1937 or 1938 and its owners are now engaging the same in certain ferry-boat services in the Northern District of California. The libel concludes with the allegation that libelants are entitled to a maritime lien against the respondent vessel, not only for the services performed upon it, but also for the services performed upon other vessels of the ferry company's so-called "fleet." Exhibit "A" attached to the libel lists the employees and the claimed balances of benefits due each.

Libelants properly joined their claims as against respondent. 46 U.S.C.A. § 604.

Respondent excepts to the sufficiency of the libel, challenging peremptorily the adequacy of the libel to state first—a cause of action for maritime lien; and second—a cause of action for maritime lien against respondent vessel for services performed by the libelants on other vessels operated by the ferry-boat company.

By way of what are called dilatory exceptions, respondent asserts that the cause of action appears on its face to be barred by laches and further that a number of uncertainties in allegation require clarification or amendment.

Libelants contend that the benefit compensation, provided for in the agreement of August 1936, was earned by them contemporaneously with and as a part of their regular wages, by virtue of their service to the vessel, and that thereby there arose and became affixed to the vessel the right of maritime lien. Respondent contends, on the other hand, that the ferry-boat company only, and not the vessel, is responsible for the payment of the benefits under the contract and that such benefits are not in their nature such wages or compensation as entitle a seaman to a maritime lien.

In a consideration of this problem, we start with the unquestioned rule that a seaman's lien is a property right given by law and arises wholly and entirely as a result of services to a vessel. The Poznan, 2 Cir., 9 F.2d 838; The International, D.C., 30 F. 375. It does not arise out of any voluntary agreement between owner and seaman. By the same token it cannot be contractually waived, 46 U.S.C.A. § 600, unless for a valid consideration. The Sirocco, D.C., 7 F. 599; The International, supra. It exists despite contract and wholly by virtue of a service to or labor upon a vessel. The International, supra; 56 Corpus Juris. 1046. In maritime law a contract may fix the term of service, the nature of the service and the amount of compensation. The amount earned for services rendered pursuant thereto, by law, automatically becomes a lien and the vessel may be appropriated as security for the payment of the debt or claim arising therefrom. The Poznan, supra.

The contract of August 28, 1936 did not attempt to determine whether or not libelants were to have a maritime lien to secure them for the payment of the benefit compensation provided for therein. If it did, such attempt would have been legally abortive. 46 U.S.C.A. § 600.

It is too well established to require substantiation by citation, that the fullest protection to seamen for *all maritime services* has always been the policy of the Admiralty. At one time or another different types and kinds of seamen's labor or service have been the subject of adjudication in admiralty and always the courts have protected and enforced the seaman's lien, so long as it spells upon

maritime services. It has never been the time, nature or extent of compensation which determines whether there is a lien, but always the test has been—has a maritime service been performed? Harden v. Gordon, 11 Fed.Cas. page 480, No. 6,047.

The subject of so-called dismissal compensation for employees losing employment through no fault of their own has received widespread consideration for many years. Just a few months before the execution of the agreement in this case, many of the railroad carriers of the country and their employees had entered into the so-called "Washington Agreement." By it, dismissal compensation was provided for employees who might lose employment because of coordinations between various railroads. Recognition of the economic benefits of dismissal compensation has been general. "Dismissal compensation may be defined as the payment of a specific sum, in addition to any back wages or salary, made by an employer to an employee for permanently terminating the employment relationship primarily for reasons beyond the control of the employee."[1]

█ It may be fairly stated that the dismissal benefits provided under the instant agreement were by way of compensation against the hazard of future non-employment. During the present world conflict, as well as during World War I., compensation paid to seamen for agreeing to sail into the war zones has been common. The basis of such compensation is the assumption by the seaman, as an integral part of his service to the ship, of an additional burden or hazard above and beyond the original call of his employment. The libelants in this case were unwilling to continue to service the ferry-boats up to the moment of abandonment without protection against a most uncertain future. After years of service upon the boats, the hazard of unemployment was most real. Hence the agreement upon the part of libelants to continue servicing the ferry-boats was a substantial quid pro quo to the ferry company whose necessity it was to maintain continuous and adequate commuter ferry-boat service until the date the bridges were ready to take over transbay traffic. Just as the seaman going into the war zone earned his compensation by agreeing to and actually serving under such hazards, so here the libelants each day and month and year of service pursuant to the agreement submitted themselves to the hazard of non-employment and thereby, from and after the date of the agreement, earned, as a part of their wages, the benefits agreed to be furnished thereby.

In The Leonidas, 4 Cir., 116 F.2d 440, 442, a seaman's lien was allowed for extra compensation agreed to be paid for extra-hazardous service to the European war zone in 1940. "There can be no question but that the so-called 'war bonus' was additional wages for extra-hazardous service. It was awarded *as a result of a demand for increased wages,* and was paid for services rendered and for nothing else." (emphasis supplied). The Leonidas, supra "Where an employer pays a bonus he has in view a benefit accruing to him, *consisting of an inducement to continuous service* and of loyalty on the part of the employee. The employee does not receive the bonus as a gift, as the literal meaning of the term would indicate, but, on the contrary, as a part of his wage." (emphasis supplied.) Johnson v. Fuller & Johnson Mfg. Co., 183 Wis. 68, 197 N.W. 241, at page 245. And in Robertson v. Wise, 153 S.C. 459, 151 S.E. 87, it was held that compensation agreed to be paid an employee in consideration of his remaining in his employer's employ for a definite period, was in fact additional compensation and a part of his wages, entitling him to a lien under the provisions of the South Carolina Civil Code.

█ That the consideration for libelants' services might be other employment, rather than cash payments, thus resulting in uncertainty in the amount of libelants' claim, does not, in my opinion, destroy their maritime lien. So long as the compensation may be translated into money or its equivalent, the lien is effective. Mere uncertainty or difficulty in calculation does not destroy the right. Equity will provide the means for ascertainment of amounts. The Bouker No. 2, 2 Cir., 241 F. 831, 834. Admiralty courts "act upon the enlarged and liberal jurisprudence of courts of equity; and, in short, so far as their powers extend, they act as courts of equity." Judge Story in Brown v. Lull, 4 Fed.Cas. pages 407, 409, No. 2,018. Furthermore, the libel alleges that all the libelants, who worked up to the time of complete abandonment, exercised their option to take the cash payments, and that partial payments were made to those who

[1] Everett D. Hawkins, Dismissal Compensation, p. 6, Princeton University Press, 1940

worked up to the time of partial abandonment, thus indicating that the ferry company elected to pay cash benefits rather than offer outside employment. Thus the claimed element of uncertainty is at least *pro forma* disposed of upon the face of the libel.

■ That the benefits might never be received by libelants, because of the occurrence of conditions subsequent fixed in the contract, likewise appears to me to be an untenable ground for rejecting the right of maritime lien. Subsequent events might nullify the obligation to pay the benefits, thus automatically terminating the lien. But the right of lien itself came into being upon the commencement of the seaman's service and continued until satisfied or otherwise disposed of. The Admiralty recognizes and protects the right to be compensated wherever it arises out of maritime service. Harden v. Gordon, supra.

■ Respondent urges that the libel does not state a cause of action for maritime lien against respondent vessel for services rendered to other ferry-boats of the ferry-boat company serving the commuter traffic of the San Francisco Bay. A factual basis is necessary, however, for the determination of that question. I cannot see how it may fairly or properly be decided upon the pleadings at this stage of the litigation. Proctors for both sides have submitted to me briefs, filed with the referee in Bankruptcy and the court, in the bankruptcy case of Southern Pacific Golden Gate Ferries, Ltd., wherein the referee after hearings, in passing upon preferred claims of libelants against the bankrupt estate, decided the same issue. These are strictly dehors the record herein. In view of the recognized rule of liberality in construing pleadings in admiralty (The New Brunswick, D.C., 125 F. 567, 571; Benedict on Admiralty, 5th Ed., p. 302) I do not feel constrained to foreclose libelants from the · opportunity to present a factual foundation in support of their so-called "fleet lien" theory.

■ The exception that the libel is barred by laches does not find support, as it must, within the four corners of the libel. Lapse of time, alone, even if exceeding state statutory prescriptions, has been held to be insufficient to establish laches as a matter of law. United States v. Alex Dussel Iron Works, 5 Cir., 31 F.2d 535; The Fulton, 2 Cir., 54 F.2d 467; Pan-American Trading Co. v. Franquiz, D.C., 8 F.2d 500. The equities and circumstances must necessarily be examined to determine whether prejudice has been caused and this can only be done, upon hearing, after answer. The Key City, 14 Wall. 653, 20 L.Ed. 896; Pacific Coast S. S. Co. v. Bancroft-Whitney Co., 9 Cir., 94 F. 180; United States v. Alex Dussel Iron Works, supra.

■ The so-called dilatory specifications of uncertainty urged in the exceptions appear to involve almost entirely matters relating to the time of service of the libelants severally. Recourse to the records of the ferry-boat company, pursuant to the Rules, will provide the information. It need not be pleaded.

For the foregoing reasons the exceptions, both peremptory and dilatory, are overruled. The same order is made in the other two causes submitted, viz: Gayner v. "El Paso" No. 23489 and Gayner v. "Klamath" No. 23488.