*Decision will be entered under Rule 50.*

NEW YORK POST CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91409. Filed August 26, 1963.

*Stanley P. Wagman* and *Joel Mallin*, for the petitioner.
*James Q. Smith*, for the respondent.

OPINION

RAUM, *Judge:* Petitioner, New York Post Corp., has been a newspaper publisher in New York for many years. It keeps its books and files its income tax returns on an accrual basis of accounting. The question for decision is whether it may deduct on its 1955 and 1956 returns the amounts of $28,987.11 and $33,513.58, respectively, which allegedly accrued in those years in respect of so-called severance pay to employees who had completed 25 years of service or attained 65 years of age but whose employment had not yet been terminated. It claims the deduction under section 162(a)(1) of the 1954 Code.[1] The Commissioner opposes not only on the ground that liability for such severance pay had not yet been properly accrued as of the end of each

---

[1] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered.

of the years, but also on the ground that section 404 [2] in any event precludes the deduction since the amounts of severance pay in controversy had not in fact been "paid" in the taxable years as required by paragraph (a)(5) thereof. The parties have entered into stipulations of fact, and, in addition, have filed certain exhibits at the hearing. We adopt the stipulations and exhibits as our findings.

During 1955 and 1956, and continuously from 1935 to 1962 (except for the period from January 14, 1939, to June 1, 1940), petitioner (sometimes referred to as the Post) operated under collective-bargaining agreements or contracts with the Newspaper Guild of New York governing wages, promotions, working hours, vacations, etc., of employees who were members of the Guild. Some of the contracts covered periods of about a year and others periods of about 2 years. Each of them had provisions dealing with dismissal or severance pay, and, as changes occurred in successive contracts in this respect, the scope of these provisions and the rights or benefits thereunder in favor of the employees were in general expanded. The history of these changes is summarized in the margin. [3]

---

[2] SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN.

(a) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income) ; but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year :

(1) PENSION TRUSTS.— * * *

\*   \*   \*   \*   \*   \*   \*

(2) EMPOYEES' ANNUITIES.— * * *

(3) STOCK BONUS AND PROFIT-SHARING TRUSTS.—

\*   \*   \*   \*   \*   \*   \*

(5) OTHER PLANS.—In the taxable year when paid, if the plan is not one included in paragraph (1), (2), or (3), if the employees' rights to or derived from such employer's contribution or such compensation are non-forfeitable at the time the contribution or compensation is paid.

(6) TAXPAYERS ON ACCRUAL BASIS.—For purposes of paragraphs (1), (2), and (3), a taxpayer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof).

\*   \*   \*   \*   \*   \*   \*

(b) METHOD OF CONTRIBUTIONS, ETC., HAVING THE EFFECT OF A PLAN.—If there is no plan but a method of employer contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or similar plan deferring the receipt of compensation, subsection (a) shall apply as if there were such a plan.

[3] The first two contracts (1935-1937) provided that no employee should be "dismissed or discharged" without notice of from 2 weeks to 3 months, depending upon the length of employment (from 6 months to 9 years or more), unless the Post at its option paid the employee a sum of money equal to the salary he would have received had such notice been given.

Beginning with the 1937 contract, the payments were designated "Severance Pay," the option was eliminated, and the Post agreed that no employee should be dismissed or discharged (except for gross insubordination or gross neglect of duty) unless the employee

The Post-Guild contracts in effect during 1955 and 1956 were dated March 4, 1955, and November 1, 1956. The March 4, 1955, contract provided, in part, as follows:

ARTICLE X—SEVERANCE PAY

Section 1

No employee shall be dismissed or discharged unless the employee be given written notice thereof and be compensated in a lump sum, or in such other form as the Publisher and the Guild may agree, in accordance with the following schedule: [Schedule provides for payments ranging from 2 weeks' severance pay for 3 months' service to 12 months' severance pay for 14 years' service, plus one week's severance pay for each additional 6 months after 21 years.]

Section 2—Computation of Severance

Severance shall be computed upon the average wage per week for the employee for the last three months worked.

Section 3

An employee dismissed for financial dishonesty or for failure to remain a member of the Guild in good standing as required under Article II, Section 1, shall not be entitled to receive severance pay. The Publisher may dismiss for gross neglect of duty or gross insubordination without necessarily paying full severance pay, except that no person eligible for severance pay under Section 4 of this Article may be dismissed without severance pay in full.

Section 4—Voluntary Termination of Employment

a. Upon reaching age 65, or upon completion of 25 years' service, an employee may terminate his employment and shall receive full severance pay. If the Guild and Publisher agree, such severance payments may be made in installments instead of in a lump sum. If an individual receiving severance pay in installments should die before the full amount due has been paid, the unpaid balance shall be paid to the employee's most recently designated beneficiary. In the absence of such designation, the Publisher shall pay the balance due to the employee's estate.

b. The Publisher shall not be obligated to accept voluntary terminations of employment requiring expenditure at the rate of more than $15,000.00 per calendar quarter in the lump sum and installment payments provided by this Section.

\*         \*         \*         \*         \*         \*         \*

be given notice *and* compensation in a lump sum of from 2 to 28 weeks' pay, depending upon length of service (graduated from 6 months to over 10½ years).

The contracts in effect between June 1, 1940, and Dec. 1, 1945, provided that the basic wage upon which severance pay was to be computed was the employee's average wage for the previous 6 months. Subsequent contracts reduced that period to 3 months.

From June 1, 1940, until Dec. 1, 1945, the contracts also provided that in the event of death the Post would pay to any designated beneficiary of a deceased employee a sum equal to what the deceased would have been paid had he been discharged. Such payment was referred to as "Death Benefit." After Dec. 1, 1945, the contracts contained a further provision that the Post would pay such death benefit severance pay to the estate of the deceased employee if he had failed to designate a beneficiary.

The Jan. 1, 1951, contract provided for the first time for severance pay to certain employees upon voluntary termination of employment. It provided, in part, that "upon reaching 65, or upon completion of 25 years' service and reaching age 60, an employee may terminate his employment and receive full severance pay." In the contract dated Mar. 3, 1953, and subsequent contracts, the words "and reaching age 60" were omitted.

The severance pay gradually increased from a maximum of 28 weeks' pay after 10½ years of service in 1937 to 12 months' pay after 14 years of service with an additional week for each 6 months of service after 21 years in 1955 and 1956.

ARTICLE XII—SOCIAL SECURITY

\* \* \* \* \* \* \*

Section 2—Death and Injury Benefits

In the event of the death of any employee, the Publisher shall pay such employee's most recently designated beneficiary the amount of severance pay to which the employee would have been entitled upon dismissal under Article X hereof. Such designation shall be in writing and shall be filed with the Publisher. In the absence of such designation, the Publisher agrees to pay the amount to the employee's estate.

\* \* \* \* \* \* \*

Section 5—Pension Plan Committee

The Publisher and the Guild shall, within sixty days from the date of signature of this agreement, appoint not more than five (5) representatives each. This Committee shall meet on demand of either party to secure and exchange information dealing with possible future pension plan or plans for the employees covered by this Agreement.

With the exception of section 5 of article XII, the same provisions were included in the contract dated November 1, 1956. However, the latter contract gave the Guild the right to allocate a portion of the wage increase set forth therein to a citywide pension fund. Such pension fund was established November 1, 1957, providing employee retirement benefits on a sliding scale up to $60 a month. An employee entitled to benefits under the pension plan and to severance payments under the applicable Post-Guild contract receives both types of payments without diminution of either. In the November 1, 1958, contract with the Guild, the Post agreed to make weekly contributions to the pension fund at a specified rate for each full-time employee.

For some years prior to and continuing at least through the tax years 1955 and 1956, the Post maintained on its books a reserve for severance pay. During 1955 and 1956 the Post made book entries reflecting increments to that reserve for its anticipated liability in respect of (1) Guild employees who had not yet reached 65 years of age or completed 25 years of service; (2) Guild employees who had reached 65 years of age or completed 25 years of service; and (3) non-Guild and nonunion employees. The Post does not claim any deduction for items (1) and (3), except to the extent that it has in fact made payments in respect of the employees referred to during the tax years, and the Commissioner has allowed the deduction to that extent. However, the Post claims that under article X of the applicable Post-Guild contracts its liability in respect of item (2) became fixed during the tax years and that it is entitled to accrue such liability and take deduction therefor. The Commissioner refused to allow the deduction for such allegedly accrued liability where employment had not yet been terminated and where no payment had yet been made. The Post had 414 Guild members in its employ in 1955 and 420 in 1956;

49 of such employees were at least 65 years of age or had completed 25 years of service as of the close of 1955, and 47 were in that category as of the close of 1956. Neither the Post nor the Guild requires that an employee retire upon reaching 65 years of age or completing 25 years of service or both.

At no time from 1935 through 1962 has the Post created any trust in respect of the severance pay reserve account or made any payments to a trust or otherwise in respect of any additions to that reserve.

The deductions presently in dispute, $28,987.11 for 1955 and $33,513.58 for 1958, represent alleged current accruals in each of those years for severance pay of those Guild employees who were 65 or had completed 25 years of service.[4]

The Post contends that its liability for such severance pay was determinable and became fixed during the tax years, and that since it was on an accrual basis of accounting it was entitled to accrue such liabilities as deductions under section 162, footnote 1, *supra*. The Government, on the other hand, argues that various alleged contingencies prevent the accrual of such liabilities during the tax years,[5] and that in any event section 404, footnote 2, *supra*, precludes the deduction under section 162 regardless of whether there were otherwise proper accruals.

Section 404 deals with deductions for employer contributions to an employees' trust or annuity plan and compensation under deferred-payment plans. It provides in substance that the deduction shall not be allowed under section 162, but if it satisfies the conditions of section 162 it shall be deductible under section 404, subject, however, to certain limitations, one of which governs the year when the deduction may be taken. In the case of contributions by accrual basis taxpayers to (1) pension trusts, (2) employees' annuities, or (3) stock bonus and profit-sharing trusts, section 404(a)(6) permits the deduction in the year of accrual only if payment is in fact made not later than the time prescribed by law for filing the return during the following year. In the case of payment of compensation under a deferred-payment plan, the statute does not permit even such limited deviation.

---

[4] These amounts reflect not only the alleged liability to employees who first became 65 or completed 25 years of service during 1955 or 1956, but also increments to such alleged liability during each of the tax years to employees who had already become eligible for classification in that category in a prior year.

The Government, of course, does not contest deduction of severance pay in respect of payments to workers in that category whose employment has been terminated, and such payments are not included in the foregoing figures.

[5] For example, the amount of severance pay depends upon two variables, length of service and the employee's weekly wage for his last 3 months' work. But, except for the comparatively brief period of 1 or 2 years during the life of a particular contract, the latter variable can fluctuate down as well as up, and may not become fixed prior to termination of employment, even as to a minimum amount measured by the employee's wages as of any particular time. Accordingly, the Commissioner argues that the severance pay in question cannot be accrued since "all the events" have not occurred which "fix the amount" of the severance pay and "determine the liability" of the Post to the employee. Cf. *United States* v. *Anderson,* 269 U.S. 422, 441.

Section 404(a)(5), which governs such payments, allows the deduction only "In the taxable year when paid." Accordingly, if the severance pay here in controversy is within the coverage of section 404 as "deferred compensation," it is undisputed that the contested deductions must be disallowed since the amounts in question were not paid during the tax years, regardless of whether liability for the payments could be regarded as having accrued during the tax years. Since we conclude, for reasons hereinafter set forth, that the so-called severance pay in issue is governed by section 404, it becomes unnecessary to consider whether the Post's liability therefore had accrued in 1955 and 1956.

Section 404 of the 1954 Code was derived from section 23(p) of the 1939 Code, as amended by section 162(b) of the Revenue Act of 1942. In explaining the 1942 amendment the House Ways and Means Committee stated (H. Rept. No. 2333, 77th Cong., 2d Sess., p. 106):

> If an employer on the accrual basis defers paying any compensation to the employee until a later year or years under an arrangement having the effect of a stock bonus, pension, profit-sharing, or annuity plan, or similar plan deferring the receipt of compensation, he will not be allowed a deduction until the year in which the compensation is paid.

See also S. Rept. No. 1631, 77th Cong., 2d Sess., p. 141. Substantially the same language was included in section 29.23(p)–1 of Regulations 111 and section 39.23(p)–1 of Regulations 118 under the 1939 Code. There can be no doubt that like criteria are applicable to section 404 of the 1954 Code. The regulations under the 1954 Code (sec. 1.404(c)) provide that the deductions in question are allowable (with certain exceptions not here material) "only for the year in which the contribution or compensation is paid, regardless of the fact that the taxpayer may make his returns on the accrual method of accounting."

It is plain from the foregoing that if payments under article X, section 4, of the Post-Guild contracts to petitioner's Guild-member employees who had reached the age of 65 or had completed 25 years of service are "compensation * * * under a plan deferring the receipt of such compensation" (sec. 404(a), 1954 Code), the deduction of the unpaid amounts in controversy must be disallowed. Do these amounts constitute deferred compensation within the meaning of the Code? We think they do.

Not only was there a "plan," as required by section 404(a), but section 404(b) provides:

> (b) METHOD OF CONTRIBUTIONS, ETC., HAVING THE EFFECT OF A PLAN.—If there is no plan but a method of employer contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or similar plan deferring the receipt of compensation, subsection (a) shall apply as if there were such a plan.

Moreover, it is clear that the payments to which qualified employees (or their designated beneficiaries or estates) became entitled under

article X, section 4 of the Post-Guild contracts represent additional "compensation." [6] And it is equally clear that such compensation is "deferred." Regardless of the historical origin of such payments and the formula for their computation, the fact is that they represent significant and substantial benefits to the employees in the nature of retirement or death benefits. And the payment of such benefits is precisely the kind of thing that the statute is concerned with.

Petitioner seeks to avoid these consequences by reliance upon section 29.23(p)-1 of Regulations 111, as amended in 1948 by T.D. 5666, 1948-2 C.B. 35, which reads in part as follows:

Section 23(p) does not apply to a plan which does not defer the receipt of compensation. Neither does section 23(p) apply to deductions for contributions under a plan which is primarily a dismissal wage or unemployment benefit plan or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan, or a combination thereof. * * *

This language was also included in Regulations 118, section 39.23 (p)-1, under the 1939 Code. When regulations were subsequently promulgated under the 1954 Code, here involved, they adopted substantially the same language quoted above, but substituted the words "solely a dismissal wage" for "primarily a dismissal wage." Income Tax Regs., sec. 1.404(a)-1(a)(2). [7]

A spirited controversy has developed between the parties as to whether the Commissioner had power to substitute the word "solely" in the new regulations for the word "primarily" in the old. Petitioner contends in substance that the interpretation of the statute had become frozen by the old regulations and that Congress, by reenacting the pertinent statutory provisions in the 1954 Code, must be deemed to have adopted that interpretation so as to preclude any change in subsequent regulations. We think it highly doubtful that the Commissioner was without power to make the change, cf. *Helvering* v. *Wilshire Oil Co.*, 308 U.S. 90, but regardless of whether the regulations use the word "solely" or "primarily," petitioner's plan involved neither "solely" nor "primarily" a dismissal wage so as to remove it from the operation of section 404.

Both versions of the regulations recognize that there are certain types of payments to employees that are not to be regarded as deferred compensation within the meaning of the statute. Thus, dismissal wages, unemployment benefits, and medical expenses are among the examples given. Cf. *Champion Spark Plug Co.*, 30 T.C. 295, affirmed 266 F. 2d 347 (C.A. 6). On the other hand, it is plain from the legis-

---

[6] Indeed, petitioner's claim to deduction under sec. 162(a),(1) is based upon the assumption that these payments constitute "compensation."

[7] The provisions incorporated in these regulations pertaining to sec. 404 of the 1954 Code were first promulgated in T.D. 6203, 1956-2 C.B. 256. Prior thereto, and shortly after the enactment of the 1954 Code, "stopgap regulations" were prescribed adopting the regulations under previous law pending the promulgation of new regulations under the 1954 Code. T.D. 6091, 1954-2 C.B. 47.

lative history that Congress was concerned about payments in the nature of retirement benefits and was particularly determined to prevent deduction where the employer had not in fact paid the amounts in question.

We think that the payments in controversy in the present case were neither solely nor primarily "dismissal" wages. Dismissal compensation has been defined "as the payment of a specific sum, in addition to any back wages or salary, made by an employer to an employee for permanently terminating the employment relationship primarily for reasons beyond the control of the employee." *Gayner* v. *The New Orleans*, 54 F. Supp. 25, 28 (N.D. Cal.), citing Everett D. Hawkins, Dismissal Compensation, p. 6 (Princeton University Press 1940). While the term "severance pay" may often be used in collective-bargaining agreements to include or refer to dismissal compensation (cf. U.S. Bureau of Labor Statistics, Bull. No. 808 (1944), p. 1), that term is also used in a broader sense to refer to payments which do not constitute dismissal compensation. Indeed, in the Post-Guild contracts in effect during the years 1955 and 1956, the term "severance pay" is used to refer to payments to be made to employees upon dismissal or discharge, upon voluntary termination of employment after reaching 65 or completing 25 years of service, and to their beneficiaries or estates upon death.

It is quite true that the early Post-Guild contracts beginning in 1935 established plans for dismissal pay, and such plans could fairly be characterized as being related solely or primarily to a dismissal wage. But those plans were progressively and radically changed as one new contract replaced another over the course of the succeeding years. The history of these changes is outlined in footnote 3, *supra*. Whatever may have been the status of the plan in 1935 as a "dismissal" wage plan, it had become by 1955 and 1956 a multi-purpose plan encompassing several different types of payments on termination of employment, only one of which involved dismissal compensation in contrast to others that were primarily in the nature of retirement or death benefits. In the circumstances it was neither primarily nor solely a dismissal wage plan during the tax years.

The payments for which petitioner here seeks deductions are those for which it was liable upon voluntary termination of employment by employees after they had reached the age of 65 or had completed 25 years of service. Those employees became entitled to such payments as of right and could not legally be deprived of them by their employer. And if death should intervene, unpaid amounts were to be paid to a designated beneficiary or the employee's estate. Such payments are in the nature of retirement or death benefits. It is no answer to say, as urged by petitioner, that those who voluntarily terminated their employment did not have to promise not to take

another job elsewhere. This is not at all unusual; persons retired on a pension may often seek other employment. The amounts here involved are substantial, consisting of at least a year's pay for those with 14 years of service. And when a pension plan was finally adopted in 1957, the modest maximum payments of $60 a month were merely supplementary to the retirement benefits involved herein.

Notwithstanding that article X of the contract is captioned "Severance Pay," the fact is that section 4 thereof which is related to the payments here in issue is entitled "Voluntary Termination of Employment" and such payments are comparable to retirement benefits for employees upon attaining a certain age or completing a certain number of years of service. Both the age involved, 65, and the minimum number of years of service, 25, are such as to justify treating the payments as in the nature of retirement benefits. They are of the type of deferred compensation that Congress had in mind when it provided that such compensation would not be deductible under section 162 but would be deductible under section 404 only in the year when paid. We sustain the Commissioner's determination that petitioner was not entitled to any deduction in respect of liability for such so-called severance pay to its workers who had reached 65 or completed 25 years of service and whose employment had not yet terminated. Petitioner had not yet made any payments in behalf of such employees so as to qualify for deduction under section 404.

*Decision will be entered under Rule 50.*