## LOVERICH v. WARNER CO.

### Nos. 7517, 7559.

Circuit Court of Appeals, Third Circuit.
March 17, 1941.

Writ of Certiorari Denied May 26, 1941.

See 61 S.Ct. 1104, 85 L.Ed. ——.

CLARK, Circuit Judge, dissenting.

———◇———

Abraham E. Freedman, of Philadelphia, Pa. (Freedman & Goldstein, of Philadelphia, Pa., on the brief), for Loverich.

Samuel B. Fortenbaugh, Jr., of Philadelphia, Pa. (Shields, Clark, Brown & McCown, of Philadelphia, Pa., on the brief), for Warner Co.

Before MARIS, CLARK, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

This is an action in admiralty to recover upon the obligation for maintenance and cure.[1] Each side has appealed; the libellant claims that the award was too limited; the respondent claims that no award at all should have been made.

The libellant, Frank B. Loverich, was in the employ of the respondent in 1925 and was the sole employee upon respondent's oil barge called "01". According to his testimony he began to suffer hoarseness following a fire on the barge in 1926, during the extinguishment of which he was exposed to smoke and weather. The condition of his throat became serious and the hoarseness more aggravated. In June, 1933 he began to suffer from dizzy spells. He was examined by the physician employed by the company who found libellant suffering from advanced arteriosclerosis, chronic laryngitis, aphonia and left incomplete inguinal hernia. The physician recommended to the company that the man was a poor risk to work, "especially around machinery or a boat, with extreme heat." Libellant was discharged on July 6, 1933. He was given a letter of recommendation setting forth his good character and long and faithful service and stating that he was obliged to leave only because of illness. That fall he was hospitalized in New York and was discharged after two months stay. Then he was employed by the Reading Company for fourteen months. He was again hospitalized for a few days and shortly thereafter secured another position which continued for about fifteen months. During this period his condition gradually became worse and both his voice and breathing were affected. In 1939 he entered the Philadelphia General Hospital for treatment and was operated on for a throat condition which was diagnosed as cancer. Rubber tubes were inserted in his throat to permit him to breathe and X-ray treatment continued following the operation. This therapy has relieved his condition somewhat.

■■ The problem presented by this litigation is what, if any, is the obligation of the employer under the maritime law of maintenance and cure which, of course, really means maintenance and care.[2] The duty to make provision for maintenance and cure is imposed by the law and is "annexed as an inseparable incident * * *" to the relation of the parties. Cortes v. Baltimore Insular Line, Inc., 1932, 287 U.S. 367, 372, 53 S.Ct. 173, 174, 77 L.Ed. 368. The nature and extent of this obligation owed to the seaman has recently been discussed by this court in Calmar S. S. Corp. v. Taylor, 3 Cir., 1937, 92 F.2d 84, and by the Supreme Court in the same case, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993. It is clear that the right of such maintenance is not restricted to those cases where the seaman's employment is the cause of the illness. It is now clear, also, that the obligation may continue after the termination of the voyage in which an injury is sustained or an illness begins. Those points are definitely settled by the decisions in the Calmar litigation.

■■■ If Loverich acquired this malignancy in the throat while employed as a seaman for the respondent then the duty of maintenance and cure arises even though it was not caused by anything incidental to his work. He did not seek to establish that the exposure to smoke and weather caused the throat cancer, although there was some medical testimony to the effect that such exposure could be a factor if there was a predisposition to that disease. Likewise, there was testimony that with this type of malignancy the patient could be active and around until it really "took him off his feet". There is a history of chronic laryngitis, improved once by treatment, but gradually becoming worse over the course of years. The company's physician suspected syphilis or cancer at the time of Loverich's discharge by the respondent. It was not until the time of the operation in the Philadelphia General Hospital that a biopsy gave the basis for the definite diagnosis of cancer. The testimony is sufficient to support the conclusion that the plaintiff's illness arose during his employment by respondent, but not that it was caused by such employment.

■ Then arises the question of the extent of the respondent's obligation, leaving out of consideration, for the moment, the fact that after the libellant was discharged by the respondent he worked for some time

---

[1] As the action was originally begun there was also a claim for indemnity, but this has been withdrawn.

[2] Calmar S. S. Corp. v. Taylor, 3 Cir., 1937, 92 F.2d 84.

for two other employers. In the Calmar case the seaman was suffering from an incurable disease which was subject to amelioration by surgical treatment. The award approved in this court was a lump sum to defray the cost of meeting both past needs and anticipated future needs, based on his life expectancy. The award of the lump sum was reversed for three reasons: (1) The amount and character of medical care required in the future cannot be measured by mortality tables; (2) marine hospital services cut down the expense of treatment for the seaman; (3) the duty to safeguard a seaman "from the danger of illness without succor,"[3] and to guard him against improvidence is not met by the payment of a lump sum to cover expenses for medical attendance during life. The Court said that the limit of the duty, in the case where the incapacity is not caused by the employment, was its extent "beyond a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment".[4] Under the decision in that case libellant here is entitled to an award for maintenance and cure for a reasonable period following the term of his employment unless payment by the respondent is relieved by the libellant's subsequent employment or laches.

██ What difference should it make in libellant's case because following the termination of his employment with respondent he worked successively for two other employers, assuming that during such period he was suffering from the disease originating during his employment by the respondent? Upon this point we find no help in the authorities. We believe, however, that while this is something of an extension of the liability imposed under the rule of the Calmar case, it is justified by the fundamental principles upon which the obligation for maintenance and cure is bottomed. It is to be noted that this man did not voluntarily leave the respondent's employment. He was dismissed on a recommendation of the company's physician who advised the company that he was a poor risk. The physician admitted on cross-examination that upon his examination of the libellant he thought he had syphilis or cancer from the chronic laryngitis. There is no evidence of syphilis. No examination was made to ascertain whether cancer was present and the man was turned out. If he was already suffering from cancer in one of its developing stages he could hardly look to subsequent employers for the performance of this obligation. We do not see how his own self-reliance in keeping going as long as he could should preclude his recovery against this respondent.

██ The last question is whether all, or any part of libellant's claim, is barred by laches. This case was started in October of 1939. The libellant was discharged from respondent's service in July of 1933. The District Court, applying the analogy of the Pennsylvania statute of limitations for contractual claims, allowed recovery only for a period beginning with the six year limitation date. We agree with the lower court's theory that the obligation is a continuous one. Therefore, the failure to recover for time prior to the six year period would not necessarily bar recovery for later time if the delay in bringing the suit did not, itself, constitute laches. The analogy to the statute of limitations, however, is only an analogy and not a rule. Pan-American Trading Co. v. Franquiz, D.C. S.D.Fla.1925, 8 F.2d 500. "Laches consists of two elements, inexcusable delay in instituting suit and prejudice resulting to the defendant from such delay. Its existence depends upon the equities of the case, and not merely upon the lapse of time." United States v. Alex Dussel Iron Works, Inc., 5 Cir., 1929, 31 F.2d 535, 536. We do not find any inexcusable delay on the part of the libellant in this case. The company's physician had advised him that treatment of his ailment was no part of the company's business and that he should see his own physician. He secured other employment and kept going as long as he could. The action was brought soon after he had been operated upon and while he was still under treatment at the Philadephia General Hospital. Nor do we see any prejudice which has resulted to the respondent from the delay. If it were necessary to go back to questions involving existence of negligence and the like in 1926 and witnesses had died or disappeared the problem might be different. But with a claim for indemnity out of the case this problem does not arise. Medical records are as available

---

[3] 1938, 303 U.S. 525, 531, 58 S.Ct. 651, 654, 82 L.Ed. 993.

[4] 1938, 303 U.S. 525, 530, 58 S.Ct. 651, 654, 82 L.Ed. 993.

now as earlier. We do not believe that the doctrine of laches has any application to this case.

■ Coupled with this question respondent further urges that if libellant makes a claim arising after March 1927 his only possible claim is under the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, sec. 5, 33 U.S.C.A. § 905. This statute expressly exempts from its provisions a "master or member of a crew of any vessel"; § 2(3), § 3, 33 U.S.C.A. §§ 902(3), 903. We believe that Loverich came within the exception as explained and applied by the Supreme Court in South Chicago Coal & Dock Co. v. Bassett, 1940, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732. He was not a mere watcher of a coal chute as the claimant was in that case. He was a licensed junior engineer and water tender and qualified as an able seaman and barge master, 2nd mate and 3rd mate. He ate and slept on board the barge. During his employment he was paid by the month. He operated the entire barge, whose voyages sometimes took six weeks. He was, therefore, in our judgment, not a harbor worker, but a seaman.

■ The unit cost of maintenance in this case has been stipulated between the parties as $2 per day. The case is remanded with directions to enter judgment for the libellant at this rate as follows: From the period of his discharge to the present, excluding therefrom (a) periods when he was employed for wages by other employers and (b) periods when he was hospitalized under circumstances where he was under no expense. Following the direction of the Supreme Court in Calmar S. S. Corp. v. Taylor, supra, there may be included in the discretion of the court below such amounts as may be needful in the immediate future at the stipulated rate up to and including April 30, 1941. There may also be included the cost of whatever medical care, if any, may have been reasonably incurred since the date of the trial and up to the period ending April 30. This without prejudice to any later suit by the libellant to recover maintenance and cure to which he may then be entitled.

CLARK, Circuit Judge (dissenting).

With diffidence[1] the writer of this dissent suggests that his learned brethren misjudge the scope of the decision of the Supreme Court in the leading case of Calmar S. S. Corp. v. Taylor[2] (coming up from our own Circuit[3]). Such a misconception, if it is one, has been expected by at least one text writer. In discussing the Calmar opinion he says: "Thus the seaman is to keep biting at his cherry. But for how long remains as *hazy* as before. The case does indicate, however, that an incurable disease arising out of the employment—that is, an occupational disease or a disease resulting from the employer's negligence—would be treated 'more liberally', though just how differently is not stated." Robinson on Admiralty pp. 299, 300, italics ours.

The seafaring man's right to "maintenance and cure" dates back to the ancient laws of the sea.[4] Article six of the Laws of Oleron reads: "If by the master's orders and commands any of the ship's company be in the service of the ship, and thereby happen to be wounded or otherwise hurt, in that case they shall be cured and provided for at the costs and charges of the said ship."[5] The duty is relational and provides a partial job insurance.[6] Its character has been stated:

In this country: "The rule of maintenance and cure is a striking forerunner of workmen's compensation acts, as it is perhaps the first assertion of a duty to care for a sick or injured workman without regard to fault of either party. Unlike workmen's compensation acts, however, it does not provide damages for permanent disability, for loss of wages after the termination of the voyage, or benefits to a widow, child, or other dependents for wrongful death.

---

[1] The dissent in Sibbach v. Wilson & Co., January 13, 1941, 61 S.Ct. 422, 85 L.Ed. —.

[2] 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993.

[3] 3 Cir., 92 F.2d 84.

[4] Smith, Liability in the Admiralty For Injuries to Seamen, 19 Harvard Law Review 418; Admiralty—Liability of Owner for Maintenance and Cure When Seaman Develops Incurable Disease in Service, 24 Virginia Law Review 920 (note); Robinson, The Seaman in American Admiralty Law, 16 Boston University Law Review 283.

[5] Cf. Laws of Wisby, Article 18; Laws of the Hanse Towns, Article 39; Marine Ordinances, Louis XIV, Bk. III, Title 4, Article II; 2 Pet. Admiralty Decisions.

[6] Robinson, Legal Adjustments of Personal Injury in the Maritime Industry, 44 Harvard Law Review 223.

Unlike liability in tort, it does not include compensatory damages for pain, suffering or disfigurement." Pillsbury, Jurisdiction Over Injuries to Maritime Workers, 18 Virginia Law Review 740, 742.

And in France:

"Pursuant to a tradition almost timeless the shipowner is obliged to furnish care to sailors who fall sick or are wounded in his service.

"That is one of the most significant aspects in which maritime law has been much more progressive than its civil counterpart: it is only comparatively recently that the law of the 9th of April 1898 has imposed upon employers responsibility for industrial accidents; ever since the Middle Ages the Laws of Oleron (articles 6 and 7) have applied to shipowners the principle of employers' liability.

"Until the law of the 4th of April 1928 set up liability insurance the maritime law was much more liberal in that respect than business law; because it was only then that employers were made responsible for disease as well as the injuries as provided by the law of the 9th of April 1898."

Translation: Danjon, Manuel de Droit Maritime, Chapitre Premier, Gens de Mer, section V, Obligations de L'Armateur, subsection 3, Traitement Medical Des Gens D'Equipage, pp. 101–102.[7]

The cases applying the doctrine have been chiefly troubled by the implications of the word "cure".[8] It was early decided that it had no element of guarantee but should be interpreted in its original sense of care.[9] Some thought that even such narrowing imposed too great a burden on the shipowner. In England,[10] on the continent,[11]

[7] "D'apres une tradition presque immemoriale, l'armateur doit faire donner des soins aux marins qui tombent malades ou sont blesses a son service.

"C'est un des points les plus saillants sur lesquels le Droit maritime a grandement devance le Droit terrestre: c'est seulement a l'epoque contemporaine que la loi du 9 avril 1898 a institue la responsabilite des patrons pour les accidents du travail industriel; des le Moyen Age, les Roles d'Oleron (art. 6 et 7) avaient applique aux armateurs le principe du risque professionnel.

"Jusqu'a la loi du 4 avril 1928 organisant les assurances sociales, le Droit maritime etait beacoup plus large a cet egard que le Droit industriel; car ce n'est pas seulement en cas de blessure, comme la loi du 9 avril 1898, mais aussi en cas de maladie, qu'il etablissait la responsabilite des employeurs." Original: Danjon, Manuel de Droit Maritime, above cited, pp. 101, 102.

[8] In The J. F. Card, Mr. Justice Brown, then district judge for the Eastern District of Michigan, speaking of sailors shipping on the Great Lakes, said:

"To say that the obligation of this ship extends to the cure of every man of [its crew] who happens to be taken sick or receives an injury while upon the vessel, no matter how long the disability may continue, would be imposing a burden upon vessel owners far beyond that contemplated by the law, or required in the interests of humanity. The court will take judicial notice of the fact that marine hospitals are established at the principal lake ports for the nursing and cure of sailors, which are supported by deduc-

tions from their wages." The J. F. Card, D.C., 43 F. 92, 95.

[9] Robinson on Admiralty, cases cited at p. 298; Admiralty Rule of "Care, Cure, and Wages" as Applied to the Great Lakes, 19 Michigan Law Review 539 (note).

[10] "The master of, or a seaman belonging to, a ship who receives any hurt or injury in the service of the ship, or suffers from any illness, not being due to his own wilful act, default, or misbehaviour, is entitled to medicine, medical advice, and maintenance until he is cured, dies, or is returned to a proper return port at the expense of the owners." 30 Halsbury's Laws of England, 2d Ed., p. 215, italics ours.

Cf. Anderson v. Rayner, 1903, 1 K. B. 589.

[11] "Yet exceptions are made of lasting disorders such as the venereal." Jacobsen, Laws of the Sea, translated from the German, 1815, p. 144.

"As the Code of Commerce did not fix the limits of the shipowner's obligation of care it lasted until the cure of the sailor. This could have resulted in a heavy if not excessive burden on the shipowner. So the law of the 12th of August 1885 permitted the captains to free the shipowner from the cost of treatment by landing the sick and injured and putting in the hands of the state a sum which has been prescribed by decrees of the 8th of September 1912 and the 31st of August 1927.

* * *

"According to the terms of Article 80 of the Maritime Code, affirming a previous jurisprudence, care to be given to a sailor ceased to be due not only when the

and finally by international convention,[12] limitations of legislative precision have been introduced. In the United States, however, the Congress has been content to leave the courts a free hand with, it is thought, not altogether satisfactory results.

The judges rejected the insistence that the duty ended with the voyage. One of them observed: "This rule may undoubtedly be subject to variations. When a course of medical treatment, necessary and appropriate to the cure of the seaman, has been commenced and is in a course of favorable termination, there would be an impressive propriety in holding the ship chargeable with its completion, at least for a reasonable time after the voyage is ended or the mariner is at home." Judge Betts in The Atlantic, Abb.Adm. 451, 480.[13]

But just how far beyond port and how far towards the conversion of the merchant marine into a public health service the courts should go, has been puzzling. Judge Hough expressed his bewilderment: " * * * we find, therefore, neither controlling authority, nor any complete consensus of opinion, as to the point left open in The Osceola, nor has our attention been directed to any decisions dealing with the cost or reasonable expense of attempted cure; neither has the length of time during which the seaman's right persists (in the event of chronic illness or long convalescence) received much judicial treatment." The Bouker No. 2, 2 Cir., 241 F. 831, 833.

The answer to the question may depend on which of the considerations of Mr. Justice Story's classic passage in Harden v. Gordon[14] should be stressed. The learned Justice gave these two reasons for the rule: " * * * On the other hand, if these expenses are a charge upon the ship, the interest of the owner will be immediately connected with that of the seamen. The master will watch over their health with vigilance and fidelity. He will take the best methods, as well to prevent diseases, as to ensure a speedy recovery from them. He will never be tempted to abandon the sick to their forlorn fate; but his duty, combining with the interest of his owner will lead him to succor their distress, and shed a cheering kindness over the anxious hours of suffering and despondency. Beyond this, is the great public policy of preserving this important class of citizens for the commercial service and maritime defence of the nation. Every act of legislation which secures their healths, increases their comforts, and administers to their infirmities, binds them more strongly to their country; and the parental law, which relieves them in sickness by fastening their interests to the ship, is as wise in policy, as it is just in obligation. Even the merchant himself derives an ultimate benefit from what may seem at first an onerous charge. It encourages seamen to engage in perilous voyages with more promptitude, and at lower wages. It diminishes the temptation to plunderage upon the approach of sickness; and urges the seamen to en-

---

sailor is cured but also when the injury is healed or when the illness has become incurable." Translation: Danjon, Manuel de Droit Maritime, Chapitre Premier, Gens de Mer, section V, Obligations de L'Armateur, subsection 3, Traitement Medical Des Gens D'Equipage, pp. 104, 105.

‡Le Code de commerce n'avait pas fixe de limite a l'obligation de l'armateur relative aux soins; donc, en principe, elle durait jusqu'a la guerison des marins. Il pouvait resulter de la une charge fort lourde, si ce n'est excessive, pour les armateurs. Aussi une loi du 12 aout 1885 (reproduite en cela par l'art. 85, C. trav. mar.), a-t-elle autorise les capitaines a liberer les armateurs de tous frais de traitement en faisant transporter a terre les malades ou blesses, et en versant entre les mains de l'autorite francaise une somme qui a ete tarifiee par un decret du 8 septembre 1912 et, en dernier lieu, par un decret due 31 aout 1927.

 * * *

"Aux termes de l'art. 80, C. trav. mar.,

confirmant la jurisprudence anterieure, les soins a donner au marin cessent d'etre dus, non seulement lorsque le marin est gueri, mais encore quand la blessure est consolidee, ou quand la maladie est devenue incurable." Original: Danjon, Manuel de Droit Maritime, above cited, pp. 104, 105.

12 " 'The shipowner is required to furnish medical care and maintenance, including board and lodging, until the disabled person has been cured or the disability has been declared permanent. However, national laws or regulations may limit liability for these expenses to not less than 16 weeks. In countries where there are arrangements for compulsory insurance, the shipowner may be relieved of liability to the extent of the coverage of the insurance plans." Summary issued by Department of Labor, International Labor Conference at Geneva, October 6-24, 1936.

13 Cf. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760.

14 Fed.Cas. No. 6,047.

counter hazards in the ship's service, from which they might otherwise be disposed to withdraw." Harden v. Gordon, 11 Fed. Cas. pp. 480, 483, No. 6,047.

The United States Supreme Court has not yet had occasion to take a position. The only point decided in Calmar S. S. Corp. v. Taylor, above cited, was the one "left open" in The Osceola, above cited. The lower courts had awarded the seaman a lump sum for care *after* the voyage. The Supreme Court reversed the lump sum judgment but remanded with directions for further proceedings. Such proceedings being the determination of amounts due, the holding ex necessitate extends the shipowner's liability beyond the port. The exact scope of such extension is not prescribed. It could not be because, as Mr. Justice Stone said: "The courts below have made no findings sufficient to enable us to fix the amount which respondent is entitled to recover." Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 532, 58 S.Ct. 651, 655, 82 L.Ed. 993.

Any words of our Highest Court are, however, properly persuasive and must be examined. Those pertinent appear on page 530 of the Court's opinion in 303 U.S., on page 654 of 58 S.Ct., 82 L.Ed. 993:

"There remain the questions whether in the case of a *chronic* illness the duty continues so long as medical attendance and care are *beneficial,* until death if the need lasts so long, and whether a lump sum may be awarded to defray the cost of meeting the anticipated need. * * *

"But we find no support in the policies which have generated the doctrine for holding that it imposes on the ship owner an *indefinitely continuing* obligation to furnish medical care to a seaman afflicted with an *incurable* disease, which manifests itself during his employment, but is not caused by it. So far as we are advised, it is without support in the authorities. We can find no basis for saying that, if the disease proves to be *incurable,* the duty extends beyond *a fair time* after the voyage in which to effect *such improvement* in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment."

Calmar S. S. Corp. v. Taylor, above cited, italics ours.

A comparison of these passages leads to this conclusion. The test is not "benefit" but is "improvement". As in *some* meanings the words are synonymous, a difference must be sought. The logical one would seem to be in assigning to "improvement" an aspect of permanency. Any scientific therapy, to use my brother's words, benefits at least in a sense of alleviation—unfortunately, it may not do more.

In this view the award goes beyond the testimony. The majority decree six years (approximately) maintenance and care. The care is that "indicated" for cancer—X-rays. They unquestionably "benefit" the sufferer. The sketchy examination of the medical witness leaves the writer uncertain as to his use of the word "improved".[15] He does not further characterize or explain and so bring the case within this dissent's interpretation of Mr. Justice Stone's dictum. For that reason, the writer prefers a remand for further proceedings. He prefers it not only because of the case at bar, but also because of the widespread implications of the problem. Both seamen and shipowners are entitled to know their rights and obligations in cases of this so dread and prevalent disease.

Although the courts have seen fit to ignore it, an illustration of confusion in the rule is found in the indiscriminate manner of its application to personnel. Formulated, in Mr. Justice Story's words already quoted, because of the "perilous service", it saves from the hazards of the garbage dump[16] or, as here, of Philadelphia harbor. The shipowners' attempts to call whatever floats a "vessel" for the purposes of limitation of liability present an inverse analogy.[17]

---

[15] Record, p. 96.

[16] The Bouker No. 2, 2 Cir., 241 F. 831.

[17] Craig v. Continental Ins. Co., 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886; Diamond Coal & Coke Co. v. Iron City Sand Co., 3 Cir., 297 F. 246, certiorari denied Diamond Coal & Coke Co. v. Hazelwood Dock Co., 265 U.S. 595, 44 S.Ct. 638, 68 L.Ed. 1197; Grays Landing Ferry Co. v. Stone, 3 Cir., 46 F.2d 394.