## MURUAGA v. UNITED STATES et al.

District Court, S. D. New York.

May 18, 1948.

William L. Standard, of New York City (Ruth H. Saslow, of New York City, of counsel), for libellant.

J. F. X. McGohey, U. S. Atty., and Joseph K. Inness, both of New York City, for respondents.

BYERS, District Judge.

The libellant seeks a decree for maintenance and cure, by reason of disability suffered by him in the month of March, 1945, while serving as chef on the Moore-McCormack Lines' steamship Uruguay, owned by the United States of America, and operated by Moore-McCormack Lines, Inc., under the usual operating contract. His condition was one of high blood pressure and hypertensive cardio vascular disease, which manifested itself during his said employment but was not caused by it.

He entered the Marine Hospital on Staten Island on March 26, 1945, and was discharged on April 27, 1945, as improved. "Recommended two weeks convalescence sick leave. Prognosis good."

He returned to the hospital on August 9, 1945, complaining of a heart condition, and remained until September 19, 1945, again being discharged as one requiring no further hospitalization and apparently "fit for duty in two weeks". Later and on October 4, 1945, he was paid $341 maintenance and cure, which was computed on a basis of 118 days, as the result of nego-

tiation between libellant and his employer, and in connection therewith he signed a release "from all claims which I may have on account of said service".

The questions for decision are:

(1) Has the libellant been paid all that he is reasonably entitled to receive for maintenance and cure?

(2) Is the release that he signed adequate as a matter of law to foreclose further recovery by him?

A consideration of the evidence yields the following:

### Findings of Fact

1. The libellant, a native of Spain and a naturalized citizen, is about 50 years of age and has followed the sea for much of his adult life.

2. As of October 4, 1945, he could read some English and speak it with understanding; he could also read and write Spanish, but signed the said release by affixing his mark.

3. During the month of March, 1945, he was a chef on the steamship Uruguay, which was being operated by the respondent Moore-McCormack Lines, Inc., pursuant to agreement with the United States of America which had taken possession of the ship under War powers.

4. The libellant had been employed by respondent Moore-McCormack Lines, Inc., since the month of April, 1942, on the steamship Brazil, until he was transferred to the ship Uruguay on July 19, 1942, as chef, and so continued until on or about March 26, 1945.

5. His wartime wages yielded him $598 per month plus a bonus of $125.

6. On or about March 8, 1945, he was conscious of dizzy spells and chills, and in a few days took to his bed in the sick bay, and on reaching New York he was removed in an ambulance to the Marine Hospital on Staten Island.

7. The illness from which he was suffering was hypertension with an indication of cardiac vascular disease which manifested itself during his said employment but was not caused by it.

8. The libellant remained in the said hospital from March 26, 1945, to April 27, 1945, on which date he was discharged, the discharge reading: "Improved. Recommended two weeks convalescence sick leave."

9. During the period of three months following the said discharge, the libellant looked for work as a chef, but failed to secure such employment.

10. On August 9, 1945, the libellant returned to the said hospital and there remained until September 19, 1945, without cost to him; on that date he was discharged, the discharge containing in substance the following: "No further hospitalization necessary. Fit for duty in two weeks."

11. After the two weeks above-referred to, the libellant called at the office of the respondent Moore-McCormack Lines, Inc., to collect his maintenance and cure.

12. A discussion was held between the libellant and witness Farrissey, the personal injury claim agent of the said respondent, in the course of which there was a question as to whether the libellant was entitled to any maintenance and cure beyond the two-weeks period following his first discharge from the hospital.

13. The libellant was dissatisfied with payment for only the said period of two weeks, and as a result of the said discussion it was agreed that he should be paid maintenance and cure for that period and also for the following three months after the first discharge (during part of which he was said to have been seeking other employment); added to which was the two-weeks period specified in his second discharge, making 118 days in all, and the libellant agreed to accept $341 in full, and executed a release "from claims which I may have on account of said service", i. e., maintenance and cure from April 27, 1945 to August 8, 1945, and from September 17, 1945, to September 30, 1945, the computation being:

```
96 days @ $2.75   $264.00
22  "   @  3.50     77.00   $341.00
```

14. The libellant understood the nature of the dispute between his employer and himself and understood the nature and

character of the release and its legal effect, when he signed it and accepted the said $341. The latter contained the words "111 Hypertension cardio vascular disease".

15. During the ensuing period of nine months ending June 7, 1946, the libellant sought other employment, believing that he was fit for duty, but he found it impossible to obtain employment as a ship's chef, since he could not pass the physical examination to obtain such employment.

16. On June 7, 1946, the libellant again entered the Marine Hospital on Staten Island, and the abstracts from the clinical records disclose the following:

"Diagnosis 1. Hypertensive cardiovascular disease.

"Condition of Patient Upon Admission " * * * He stated that he had had 2 previous hospitalizations and due to the recurrence of symptoms he reported at this time for medical advice and treatment.

"Physical examination disclosed the above diagnosis and an X-ray was taken of the heart which showed it to be of hypertensive type of configuration, and there appeared to be some left ventricular enlargement; the intravenous pyelogram showed absence of the left kidney shadow; the right kidney shadow showed good excretory powers. An electrocardiogram showed the right axis deviation T-2 and T-3 sharply inverted and T-1 diphasic, and there was a suggestion of an old posterior infarction.

"This patient was given a trial caudal and showed good response and it was therefore felt that a Smithwick procedure was justified; a sympathectomy was performed on August 2, 1946; he had a good post-operative course following this operation and his blood pressure was 114/90 standing and 200/110 lying down.

"Upon discharge from this hospital the patient's condition had improved; the prognosis was considered to be good; and 1 month was recommended for a period of convalescent leave at the Merchant Marine Rest Center, Gladstone, N. J.

"On November 21, 1946 this patient reported to the out-patient department at which time he stated that he was feeling quite well and at this time it was stated that the patient should be fit for duty about January 1, 1947. He was re-examined on January 2, 1947, at which time he had no complaints; wounds had healed well and he was considered to be fit to return to duty."

17. The payment of maintenance and cure at the agreed rate stated in Finding 13 above fairly measured the financial responsibility of the respondents toward the libellant for maintenance and cure rendered necessary by the illness to which he fell a victim as stated in Findings 6 and 7 above.

Conclusions of Law

1. The libellant, having been fully and fairly compensated for maintenance and cure in the sum of $341, is not entitled to any further recovery on that account.

2. The release signed by the libellant on October 4, 1945, was based upon a fair and complete understanding on the part of the libellant of the nature of the illness which overtook him during March of 1945, and its effect upon him and upon his rights to maintenance and cure arising therefrom, and the consideration therefor, namely, $341, was a fair and reasonable sum for the respondents to pay to the libellant in settlement of his claim for maintenance and cure.

Comments

█ Doubtless it was a great disappointment to the libellant to find his health so impaired that he could not continue in his well-paid calling, but that is not in itself a sufficient reason to visit upon the respondents what in effect seems to be a claim that he is entitled to maintenance and cure for the balance of his life. I do not think the law justifies such an assertion.

This case seems to come squarely within the decision of Calmar Steamship Corporation v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993. At page 530 of that opinion, 58 S.Ct. at page 654, it is said:

"We can find no basis for saying that, if the disease proves to be incurable, the duty extends beyond a fair time after the voyage in which to effect such improvement in

the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment. This would satisfy such demands of policy as underlie the imposition of the obligation. Beyond this we think there is no duty, at least where the illness is not caused by the seaman's service."

And at page 531 of 303 U.S., at page 655 of 58 S.Ct.:

"The seaman's recovery must therefore be measured in each case by the reasonable cost of that maintenance and cure to which he is entitled at the time of trial, including, in the discretion of the court, such amounts as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained."

As has been stated, the period embraced in the amount paid in settlement is 118 days or over three months after the first two-weeks convalescence period mentioned in the discharge of April 27, 1945. During that interval the libellant says that he tried to procure other employment, which means that he must have been sufficiently recovered to enable him to make that effort, and to justify him in thinking that he was physically able to undertake a resumption of his occupation; but by that time his physical impairment had so developed as to reveal itself during the medical inspection which a steamship line has to require in order to protect itself against the employment of those likely to become disabled in the course of performing their ordinary duties, with the result that he could not be accepted.

In other words, the libellant had become a victim of a disabling physical condition, and there is no lack of sympathy for that misfortune which is to be spelled into this decision. The duty that confronts the Court is to reach a conclusion, if that be possible, which fairly embodies the extent of the respondents' duties toward the libellant under this branch of the law.

■ The two periods of hospitalization resulted in apparent improvement in libellant's condition, and two recommended periods of inactivity for convalescence,

for both of which he has been paid, plus an additional three months, were the basis of the payment to him.

This seems fairly to meet the respondents' obligation for maintenance and cure.

The following are thought to be in accord with the views here expressed: United States v. Loyola, 9 Cir., 161 F.2d 126; Tawada v. United States, 9 Cir., 162 F.2d 615; Erotokritos v. Velousios, 5 Cir., 104 F.2d 761; Lindgren v. Shepard S. S. Co., 2 Cir., 108 F.2d 806; Rey v. Colonial Navigation Co., 2 Cir., 116 F.2d 580; Campbell v. American Foreign S. S. Corp., 2 Cir., 116 F.2d 926; Loverich v. Warner Co., 3 Cir., 118 F.2d 690.

■ Also the release must be dealt with; it must either be given effect according to its terms, or be disregarded on the theory that, when executing it, libellant did not know the nature of his malady.

As to that, I am persuaded by the hospital records, and the language of the release, that he was truly informed, although he testified to the contrary.

His long experience at sea was compatible with an understanding of his right to maintenance and cure. The intelligence which he manifested on the witness-stand— which was consistent with his high earning capacity—also tended to indicate that he knew what the release meant, and that he deliberately entered into the settlement of which it was an incident, with a fair understanding of all that was involved in making the adjustment.

The libellant's subsequent hospitalization, as recited in Finding 16, is set forth in order that a reviewing court may observe that the subject has not been here ignored. It is not thought to even tend to prove that the release was executed by one who was not fully apprised of his physical ailments when he executed it.

The release is believed to meet the tests discussed in the case of The S. S. Standard, 2 Cir., 103 F.2d 437.

It results that the libel must be dismissed, but without costs.

Settle decree.