### NEVILLE v. AMERICAN BARGE LINE CO.

No. 214.

United States District Court
W. D. Pennsylvania.

June 18, 1952.

See also, D.C., 105 F.Supp. 405.

Hymen Schlesinger, Pittsburgh, Pa., for libellant.

Clyde Armstrong, J. Roland Johnston, Thorp, Reed & Armstrong, Pittsburgh, Pa., for respondent.

STEWART, District Judge.

This is an action by an injured seaman to recover maintenance and cure during the period of recuperation. The case was tried by the Court without a jury and upon all the evidence, we make the following

### Findings of Fact

1. On June 9, 1950, the libellant, Buelah L. Neville, was employed by the respondent as a laundress on the motor vessel "Trade Winds".

2. The respondent is a corporation having an office for the transaction of business in the City of Pittsburgh, Pennsylvania.

3. The "Trade Winds" was a motor vessel with a total horsepower of 1400 and at all times herein mentioned was owned and operated by the respondent. It was practically a new boat, having been commissioned during March, 1950, with a fully equipped galley.

4. The "Trade Winds" was enroute up the Ohio River with a tow of 14 barges on June 9, 1950, and at approximately 8:30 P.M. arrived in the vicinity of Lock No. 41, at or near Louisville, Kentucky.

5. By reason of the fact that at the time the "Trade Winds" arrived in the vicinity of Lock No. 41, another vessel proceeding down the river was in the process of going through the locks, it was necessary for the "Trade Winds" to wait for some time before entering the lock.

6. The Captain of the vessel, Lewis Enlow, who was at that time on duty as pilot, did not cause the vessel to be tied up to the shore or to the lock, but held the vessel in midstream by using enough power from the engines to counteract the current, thereby holding the vessel stationary in the river. The boat continued motionless in the river until the happening of the accident to the libellant, Buelah Neville. The boat did not strike any object and there was no jolt, jar or jerk to the boat which would have contributed to the accident hereinafter described.

7. The position of the boat was approximately 400 feet from the Kentucky shore and the head of the tow was approximately 200 feet below Sand Island. At the time of the accident, Captain Enlow had the boat's searchlights on, pointed toward Sand Island.

8. At approximately 9:20 that evening, the libellant, Buelah Neville, went to the galley, or kitchen, for the purpose of getting herself a cup of coffee. Notwithstanding that there were two pitchers filled with condensed milk (usually referred to in the testimony as cream) in an unlocked refrigerator in the dining room of the boat, Mrs. Neville proceeded to open a new can of milk or cream. Notwithstanding further that there were two types of hand can openers in the cutlery drawer in the galley, one of which was capable of being used to punch a hole in a can of milk, and a larger can opener fastened to a table in the galley, also capable of being used to punch a hole in a can of milk, Mrs. Neville used a meat cleaver for this purpose.

9. One of the hand can openers was of the ordinary type, having a pointed knife-like blade with which holes could be punched in a milk can, and the other was a rotary type ordinarily used to remove the entire top of a can. In addition, fastened to the table, was a large can opener of the rotary type, likewise customarily used for removing the entire top of a can, but capable of being used to punch a hole in a milk can.

10. When libellant attempted to open the can, the cleaver slipped and severely cut the first two fingers of her left hand.

11. Mrs. Neville immediately went to the room of the cook, Gladys Grubbs, who took Mrs. Neville into her bathroom and put the bleeding hand under water. The cook then summoned the libellant's son, Raymond Neville, who was employed on the boat as a deck hand and was sleeping in his room at the time.

12. Donald Ivy, a striker on the boat, saw Mrs. Neville walking through the engine room holding her hand in a peculiar fashion. He noticed several drops of blood on the floor, so he followed her to the cook's

room. Seeing the seriousness of the situation, he went to the pilot house to summon the Captain.

13. In the pilot house with the Captain was Fred Hoyt, a steersman and the boat's clerk. When Ivy told them of the accident, the Captain immediately sent Hoyt to investigate, and when Hoyt found that the injury was serious, he returned to the pilot house and told Captain Enlow it was a matter for his attention. Meanwhile, the Captain, acting as pilot, had begun to work the boat up toward the foot of Sand Island, for the purpose of shoving the tow against the Island where it would be a rather simple operation within the qualifications of Hoyt, the steersman, to hold the boat and tow against the foot of the Island.

14. Having landed the tow against the Island at approximately 9:40 or 9:45, Captain Enlow went down to examine the libellant. Meanwhile, Raymond Neville, libellant's son, had put a tourniquet on his mother's arm. The Captain loosened the tourniquet and observed the blood was not spurting, so he treated libellant's injury with merthiolate and instructed her son to watch the flow of blood and to tighten the tourniquet if she started to bleed profusely.

15. The Captain returned to the pilot house and called the Lock Master by radio telephone, and ordered a cab. He then maneuvered the boat over near the lock and had the libellant put ashore, in the company of Hoyt and her son and another member of the crew who needed medical treatment for another reason. The Captain gave Hoyt what is called a "hospital ticket", entitling the libellant to entry into and free treatment at the Nichols Hospital, a government institution in Louisville, Kentucky.

16. The libellant was taken off the boat and placed in the waiting taxi cab at about 10:00 o'clock.

17. Hoyt, Mrs. Neville, her son, Raymond Neville, and the other crew member arrived at the Nichols Hospital where Hoyt presented the hospital ticket to one of the attendants. Hoyt waited for approximately 20 minutes and then inquired of one of the hospital attendants whether he should stay, and was told he need not, whereupon he returned to the boat.

18. Mrs. Neville remained in the Nichols Hospital for about five days, when, at her request, she was transferred to the Holzer Hospital at Gallipolis, Ohio. She remained in that hospital for about five days. After she left the hospital, she returned every day for treatment for a period of three weeks, and then for another period of three to four weeks she went to the hospital for treatment every other day, and finally returned for treatment every three or four days.

19. On October 30, 1950, the libellant, Buelah Neville, was admitted to the Marine Hospital in Cleveland, Ohio. She remained in the hospital until December 16, 1950. She was readmitted on March 11, 1951, and discharged on April 20, 1951.

20. During the period the libellant spent in the Marine Hospital in Cleveland, Ohio, she was under the care of Dr. Mark E. Myers, Chief of the Surgical Service of that hospital.

21. Dr. Myers' opinion was that atrophy of the muscles of the left arm was caused by the disuse of the arm following the trauma and subsequent infection which had developed. A partial amputation of the index and long fingers was recommended. She was given treatment for her left shoulder consisting of manipulation under anesthesia, which broke up the adhesions, and 80 to 90 percent motion of the left shoulder was obtained in all directions. At the time of her discharge there was considerable improvement in the motion of the shoulder.

22. On November 24, 1950, the left index finger was amputated through the proximal phalanx, and at the same time capsulotomies were performed on the metacarpal phalangeal joints of the index and long fingers of the left hand. When the wounds were healed, she was discharged, viz., on December 16, 1950, and before leaving the hospital she was given instructions in exercises by the physiotherapist at the hospital and instructed to continue these exercises after she went home.

23. On March 26, 1951, Mrs. Neville's long middle finger was amputated through the distal end of the proximal phalanx.

24. She was discharged on April 20, 1951, with instructions to continue hand and finger physiotherapy at home.

25. During the period that Mrs. Neville was a patient at the Marine Hospital in Cleveland, Ohio, she underwent treatment for various other ailments, none of which bore any causal relation to the accident of June 9, 1950.

26. There is a direct causal relation between the injury sustained by the libellant and the atrophy of the muscles of the left arm and shoulder.

27. Up to the date of the conclusion of the trial, December 4, 1951, the libellant had not reached the point in her recovery where care and further treatment would not benefit her.

Conclusions of Law

1. This Court has jurisdiction of this suit by virtue of Section 1333 of Title 28 of the United States Code.

2. Libellant was injured on June 9, 1950, during the period of her service as an employee of the respondent on the vessel "Trade Winds".

3. Among the most pervasive incidents of the responsibility anciently imposed upon a ship owner for the health and security of sailors was the liability for the maintenance and cure of seamen who became ill or were injured during the period of their service. In the United States this obligation has been recognized consistently as an implied provision in contracts of marine employment and the liability in no sense is predicated on the fault or negligence of the ship owner. Aguilar v. Standard Oil Co., 1943, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107.

4. So broad is this obligation, that negligence or acts short of culpable misconduct on the seaman's part will not relieve the ship owner of the responsibility and only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of this protection. Aguilar v. Standard Oil Co., supra.

5. The acts of the libellant in this case do not constitute wilful misbehavior or deliberate indiscretion, but, rather, rise only to the level of negligence.

6. For these reasons, the libellant is entitled to recover for maintenance and cure until the maximum degree of improvement is reached. Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850; Shields v. United States, 3 Cir., 1949, 175 F.2d 743.

7. Counsel for the parties entered into a stipulation at the pre-trial conference that if it should be determined that maintenance and cure is due and owing, then the amount should be at the rate of $4 per day.

8. Libellant is not entitled to any maintenance and cure during the period when she was hospitalized under circumstances where she had no expense. See Loverich v. Warner Co., 3 Cir., 1941, 118 F.2d 690.

9. Therefore, we conclude that the libellant is entitled to recover an amount of $1,784 for maintenance and cure computed at the rate of $4 per day for the period from the date of the injury, June 9, 1950, to and including the date of the conclusion of the trial, December 4, 1951 (543 days) less the number of days she was hospitalized at no expense to herself (97 days).

10. Judgment will be entered accordingly.