Otto S. TAYLOR, Libellant,

v.

Max P. CRAIN and Mason W. Crain, now amended to Max P. Crain and Jacqueline B. Crain, Administratrix of the Estate of Mason W. Crain, deceased, Respondents.

Nos. 165, 181, 205.

United States District Court
W. D. Pennsylvania.

March 5, 1954.

On motions for new trial or in alternative to open the judgment
July 15, 1954.

Hymen Schlesinger, Pittsburgh, Pa., for Otto S. Taylor.

H. A. Robinson, Dickie, McCamey, Chilcote, Reif & Robinson, Pittsburgh, Pa., for Max P. Crain and Mason W. Crain (now deceased).

Harland I. Casteel, Campbell, Houck & Thomas, Pittsburgh, Pa., for Crain Bros., Inc. and Jacqueline B. Crain, Adm'x.

MARSH, District Judge.

The libellant filed his libel on January 30, 1950, in Admiralty No. 165, against Crain Brothers, Inc. This action was discontinued at the trial. On August 15, 1950, he filed his libel against Max P. Crain and Mason W. Crain[1] at No. 181 in Admiralty, alleging that while he was employed as a deckhand by the respondents, he was injured on May 28, 1945, because of the unseaworthiness of the vessel on which he was working and because of negligence for which respondents are liable.

On October 3, 1951, he filed his libel for maintenance and cure in Admiralty No. 205.

Mason W. Crain died on November 6, 1951. His death was suggested by counsel for respondents on March 4, 1952. On December 3, 1953, a few days before trial, the libellant moved to substitute the administratrix of the estate of the decedent as a party respondent.

Counsel for the administratrix objected to the substitution, averring as his sole reason in opposition that more than two years had elapsed since the death of Crain and citing Rule 25(a)(1) of the Rules of Civil Procedure, 28 U.S. C.A.[2] This objection was overruled and the substitution allowed prior to the trial

1. At pretrial it was stipulated that the respondents were partners.

2. The pertinent part of Rule 25(a)(1) is:

"If a party dies and the claim is not thereby extinguished, the court within 2 years after the death may order substitution of the proper parties. If substitution is not so made, the action shall be dismissed as to the deceased party."

because the court thought that the action for unseaworthiness survived and that the Federal Rules of Civil Procedure "do not apply to proceedings in admiralty", Rule 81(a)(1). In addition, no prejudice to the estate was shown likely to result by allowing the delayed substitution, whereas a refusal conceivably might result in serious prejudice to libellant.

Pursuant to the mandate of the Court of Appeals in Taylor v. Crain, 3 Cir., 1952, 195 F.2d 163, reversing, D.C., 98 F.Supp. 149, and our practice in Slepski v. Dravo Corp., D.C.W.D.Pa.1951, 104 F.Supp. 89, and Crumrine v. Jones & Laughlin Steel Corp., D.C.W.D.Pa.1951, 104 F.Supp. 92, testimony was taken on the issue of laches, on which issue the court makes the following

### Findings of Fact

1. Libellant filed his libel on August 15, 1950, alleging that injuries suffered on May 28, 1945, were caused by unseaworthiness and negligence.

2. At the time of the accident Max P. Crain, one of the respondents, was the captain of the vessel on which the injury occurred. This captain did not, as alleged in the libel, promise employment to libellant if he did not make a claim on account of his injuries, nor did he threaten to black-list him if he did file a claim.

3. The other respondent, Mason W. Crain, who died November 21, 1951, did not in his lifetime, promise libellant steady employment or state that he would prevent libellant from obtaining employment with other firms if a claim were filed. The evidence offered to prove that this decedent made such a statement to this libellant on May 29th or 30th, 1945, is incredible.

4. Respondents had prompt notice of libellant's injuries and libellant made a claim with respondents' insurance carrier, New Amsterdam Casualty Company, on July 6, 1945, and entered into an agreement for compensation at the rate of $18 per week under the Workmen's Compensation Laws of Pennsylvania, approved July 20, 1945, by the Bureau of Workmen's Compensation.[3]

5. The delay of over five years in filing the suit for unseaworthiness in admiralty is inexcusable.

6. The respondents were not prejudiced by the failure of libellant to file his libel for unseaworthiness for this period.

### Discussion

Libellant attempted to prove by Alda Mae Wright that the delay in filing his libel over five years after the accident was excusable. Mrs. Wright testified that she was present in libellant's room shortly after the accident over eight years ago, and overheard a conversation between libellant and Mason W. Crain, the deceased respondent. She testified that Mr. Crain said to libellant, "If you do not bring suit I will see you have a job as long as you live, but if you do bring suit I will have you black-balled off the river."

Mrs. Wright was illiterate. She cleaned the rooms in the rooming house where libellant lived. She was unable to describe Mr. Crain correctly. She said she never saw him with his hat off. She said she observed him talking to libellant three times subsequent to the conversation mentioned, but on those occasions, it appears, she was not permitted to overhear the conversations.

In view of the fact that respondents were insured and the insurance company promptly took up with libellant the matter of his injuries, and entered into a compensation agreement on July 6, 1945 (albeit erroneously) to pay him compensation in accordance with the Pennsylvania Workmen's Compensation laws, we find it too difficult to believe that Mason Crain, without any proved benefit to his firm, tried to intimidate libellant. It is equally difficult to give credence to Mrs. Wright's testimony that she, the cleaning woman, was on hand and permitted by Crain to overhear the stultify-

---

3. There was no evidence that compensation was actually paid to libellant.

ing part of his conversation with libellant.

Further, within eight months after the accident, libellant, voluntarily so far as is appears, left respondents' employment and went to work for another company, and since then, for several other companies. His willingness, without protest, to so quickly disregard the alleged promise of lifetime employment is another circumstance tending to brand it and the threat as fabrications.

However, libellant has proved that respondents were on notice of his fall and injuries on the day of the event and, through their insurance company, had timely opportunity to investigate the accident, review the details, and ascertain the names of witnesses. Moreover, there has been hardly more than a suggestion on behalf of respondents that they have been prejudiced by the delay. The trial demonstrated that the eyewitnesses and the employment records were available. With respect to the element of prejudice, we think libellant has sustained his burden of proof. Accordingly, the motion for dismissal on the ground of laches will be denied. Cf. Loverich v. Warner Co., 3 Cir., 1941, 118 F.2d 690, 693, citing United States v. Alex Dussel Iron Works Inc., 5 Cir., 1929, 31 F.2d 535, 536.

### Conclusions of Law

1. The libellant's suit predicated on negligence under the Jones Act, 46 U.S.C.A. § 688, is barred by the three-year limitation period, 45 U.S.CA. § 56, Taylor v. Crain, 3 Cir., 195 F.2d 163, at page 164, supra.

2. The libellant's case at No. 181 in Admiralty predicated on unseaworthiness in admiralty is not barred by analogy to the Pennsylvania two-year statute of limitations, 12 P.S.Pa. § 34, because the respondent was not prejudiced by the delay.

3. Respondents' motion to dismiss on the ground of laches will be denied.

On the merits of Nos. 181 and 205 in Admiralty, the court makes the following

### Findings of Fact

1. Libellant at the time of filing his libel on August 15, 1950, was a citizen of Pennsylvania and resided in the City of Pittsburgh. At the time of trial he resided at Wadestown, West Virginia.

2. The respondents, Max P. Crain and Mason W. Crain, were, at the time of filing the libel, citizens of Pennsylvania, having their principal place of business in Pittsburgh.

At all times pertinent to these suits prior to November 6, 1951, they were partners engaged in river transportation. Mason W. Crain died November 6, 1951, and Jacqueline B. Crain, administratrix of the estate of Mason W. Crain, was substituted as a respondent over her objection.

3. On May 28, 1945, the respondent, Max P. Crain, was the captain of the steamer "Allegheny," a towboat in navigation on the Ohio River and its tributaries, and libellant was employed by the respondents on that date as a deckhand.

4. Part of the coupling apparatus on this vessel consisted of two steel knees situate on each side of the main deck near the bow.

5. The port knee is a triangular structure. One side rises at right angles to the main deck and is about 7 or 8 feet high; the base is fastened to the deck; 8 to 10 steps form the hypotenuse and lead from the deck to the top of the knee. The steps are about 18 inches wide. The platform at the top of the knee is about 18 inches by 12 inches.

6. A hand railing constructed of 1 inch or 1¼ inch pipe extended up the right side of the steps at the uniform height of approximately 30 inches to the top of the knee. The pipe was continuously welded and was fastened to the steps by steel rods.

7. Over the main deck is the boiler deck; the forward edge of the boiler deck is about four feet from the top of the port knee and substantially on the same plane with it.

8. On the morning of May 28, 1945, shortly after 6:00 o'clock, the "Alle-

gheny" was on the Ohio River in the vicinity of Conway, Pennsylvania, for the purpose of picking up empty coal barges belonging to the Hillman Coal Company, which barges were among the fleet of barges moored at this landing. The captain, Max P. Crain, was operating the vessel and brought it into the fleet of barges broadside on the port side. At this time the libellant was standing at the top of the port knee, which position he took probably for the purpose of assisting the captain to identify, if possible, the numbers on the barges, and from this position to board a barge, if feasible.

9. At the time of the accident Charles C. McConnell, the watchman, was stationed on the main deck forward in view of the captain, who was in the pilothouse located on the boiler deck. William T. Coleman, the pilot, was off watch but was still in the pilothouse. Libellant could be seen by all of these men as he stood on the top of the knee. Another deckhand was on duty but his name and position at the time of the accident are unknown.

10. After the vessel came to rest there was 3 to 4 feet intervening between it and the nearest barge. Libellant, who was facing forward, turned and faced the pilothouse and attempted to jump the distance from the top of the knee to the boiler deck.

11. There was less risk of injury in jumping to the boiler deck than jumping to the barge; but jumping to either place was unnecessary and libellant could have descended the steps of the knee to the main deck and ascended the nearby steps leading to the boiler deck from which he could have safely boarded the barge, if ordered to do so, by stepping to its platform which is some 8 or 10 feet wide.

12. Libellant failed to complete the jump to the boiler deck and fell to the main deck, suffering certain injuries. Whether he slipped on the steel tread of the knee in attempting to make the jump is conjectural.

13. At the time of the accident the "Allegheny" was commanded by a licensed captain and pilot, Max P. Crain, and carried a sufficient crew, three of whom, including libellant, were on duty.

14. The vessel was equipped with two ratchets and wires used in the operation of coupling to and controlling a tow. These appliances were placed on the forward main deck between the knees, which was a necessary and proper place for them.

15. The vessel was not unseaworthy in any of the particulars alleged to have caused or contributed to libellant's injuries. His injuries were the result of his voluntary act of jumping.

16. The libellant continued to work as a deckhand on the day he was injured and remained on the vessel until the "Allegheny" reached Brownsville on the morning of May 29th or May 30th.

17. Libellant did not immediately complain of any injuries and performed his duties for the balance of the watch and had lunch and dinner with the crew. The next morning his left ankle was swollen and he was unable to work further. He left the boat at Brownsville, Pennsylvania, and took a taxi to his rooming house in North Side, Pittsburgh.

18. The master gave libellant a ticket to the Marine Hospital but the libellant sought the services of Dr. F. X. Straesley, who was not connected with the Marine Hospital.

19. The libellant's injuries consisted of a probable chip fracture of the internal malleolus of the left ankle, with a sprain of the ankle and bruises, contusions and sprains of the muscles of the left leg and hip.

20. The libellant was off work from the 29th of May, 1945, to the 9th of June, 1945; he then worked until the 28th of June, at which time he left the vessel due to the injuries suffered in the accident.

21. Since July 1, 1946, the libellant has worked with fair regularity until he was injured on December 31, 1952, in

the employ of the Crucible Steel Company.

22. The evidence is not convincing that libellant, since January 5, 1946, was unable to work or suffered disability as a result of the accident in May, 1945.

23. A reasonable time for recovery from the injuries which libellant sustained cannot be determined from the evidence but by January 5, 1946, libellant had attained maximum recovery from the injuries sustained on May 28, 1945.

24. The parties agreed that maintenance, if any, should be compensated at the rate of $4.50 per day; after deducting the 20 days libellant worked in June, 1945, he is entitled to maintenance for 201 days.

### Discussion

█ It is my judgment that the weight of the credible evidence does not establish that the "Allegheny" was unseaworthy in the several particulars pressed by the libellant. The testimony of William T. Coleman, a novice pilot at the time of the accident, was offered to establish that there was no handrail on the port knee, and that if there had been a handrail libellant would not have fallen over the side of the steps of the knee onto the ratchets and wires lying on the deck. The preponderance of the evidence convinces me that there was a handrail on the inside of the port knee and that libellant was injured solely because he attempted to jump from the knee to the boiler deck. The libel avers that libellant slipped on the steps of the knee and fell because of the presence of oil, water and grease. No evidence was offered to sustain this averment, probably for the reason that objections to libellant's testimony were sustained because of the death of one of the partner respondents. Act of 1887, May 23, P.L. 158, § 5, cl. (e), 28 Pa.P.S. § 322; Wright v. Wilson, 3 Cir., 1946, 154 F.2d 616, 170 A.L.R. 1237.

It is my judgment that libellant did not suffer an impacted fracture of the head of the left femur or any injury which shortened the neck of that femur. The clinical record of the United States Public Health Service, with which Dr. Bloom has long been connected, contained an x-ray report not taken by Dr. Bloom and not available for inspection, which indicated a shortening of the femur of the left hip joint. Most of the doctors' testimony as to libellant's injury, pain and disability, was based on this supposition. On the other hand, the respondent introduced into evidence five x-ray pictures of libellant's hip joint, one of which shows the right hip joint for comparison, which, along with the supporting testimony of two doctors, one of whom took the pictures, are convincing that there is no shortening of the left femur. It is to be expected that, if there had been a fracture, some vestige thereof would show up in these pictures, but even to a layman, the bony structure of the left hip joint looks identical to the uninjured right hip joint. The x-rays taken by Dr. Sheedy, corroborated by his testimony and that of Dr. Bruecken, are convincing that on November 23, 1951, libellant had a normal left femur which had never been fractured.

In addition libellant visited the Marine Hospital four times for other complaints before he complained of his hip. He was attended by two doctors, neither of whom he subpoenaed, although both were in Pittsburgh, and there was no suggestion that either would testify that libellant suffered a fractured hip in the accident. The fact that libellant was able to walk immediately after the occurrence, and return to light work within two weeks, helps to weight the scales against a finding that his left hip was fractured.

The evidence offered by libellant of the extent of his injuries is far from satisfactory. He did not call as witnesses the doctors in Pittsburgh who attended him, and no satisfactory reason was advanced for his failure to do so. The usual inference arises that their testimony would not have been favorable to him. He was not confined to any hospital in consequence of his injuries, although he could have gone to the Marine Hospital then

*in* Pittsburgh. It seems that it was not until 1950 that he complained to Dr. Bloom, of the Marine Hospital, of pain in his left hip and back, but between the time of the accident and the complaint to Dr. Bloom, libellant had been involved in several accidents, the extent of which was not disclosed, although the injuries and complaints apparently were of a minor nature.

On the evidence as presented we find it particularly difficult to make accurate findings of the extent of libellant's injuries and when he recovered therefrom. There was no evidence presented which would indicate to the court a reasonable time in which a person normally would recover from a chip fracture of the internal malleolous of the left ankle. We do find, however, that he went to work for Chas. Zubic and Sons on January 5, 1946. Although it appears that he worked only that one day, no reason is advanced for his failure to continue to work. Thus, from this meagre evidence we conclude as of that time that he had recovered from the injuries received in the accident.

It is urged that the libellant has not sustained the burden of proof relative to the extent of his injuries and recovery therefrom, and strictly speaking, perhaps this is true. On the other hand, respondents, if they so desired, could have subpoenaed libellant's doctors and filled in the gaps of the proof. We have determined that respondents' contention concerning libellant's failure to meet the burden of proof must fail. We have applied the maintenance and cure rule that seamen, as wards of the Courts of Admiralty, should be the beneficiaries of a liberal attitude in harmony with sound maritime policy.

Libellant has pressed the fact that there were several places between Conway and Brownsville where he could have been placed ashore and taken to a doctor or a hospital; but it does not appear that he asked to be placed ashore for that purpose, nor does it appear that his injuries were aggravated by reason of the fact that he was not taken to a doctor or a hospital before the vessel reached Brownsville. As it turns out, he took a taxi from Brownsville to his rooming house in Pittsburgh where medical attention was available. The fact that he suffered no damage by reason of the delay in securing medical attention for him makes it unnecessary to decide whether this alleged negligence is barred by the statute of limitations, or whether such delay is a type of unseaworthiness, as plaintiff claims.

Conclusions of Law

1. This court has jurisdiction under the Jones Act, 46 U.S.C.A. § 688, and under § 1333 of the Judicial Code, 28 U.S.C.A.

2. The injuries which libellant received on May 28, 1945, were not the proximate result of unseaworthiness of the towboat "Allegheny," and he is not entitled to recover damages for his injuries in the action at No. 181 in Admiralty.

3. Libellant is entitled to recover maintenance in the action in Admiralty at No. 205, for a period of 201 days at the rate of $4.50 per day, or a total of $904.50.

4. Libellant is entitled to a judgment in the action at No. 205 in Admiralty in the sum of $904.50.

5. Respondents are entitled to a judgment in the action at No. 181 in Admiralty.

On Motions for New Trial Or in Alternative To Open the Judgment

On March 5, 1954, the court entered judgment at No. 181 in Admiralty in favor of the respondents, and at No. 205 in Admiralty in favor of the libellant in the amount of $904.50. These actions are now before the court on libellant's motion for a new trial or, in the alternative, to open the judgments and admit further testimony.

Libellant assigns four reasons for granting the motion, the substance of which is as follows:

(1) Since the hearing, libellant has discovered new evidence in the form of a photograph of the steamer "Allegheny" taken within a short time of the accident, which photograph indicates the absence of a handrail on the port towing knee.

(2) Libellant is trying to locate other crew members who did not testify and believes and expects that they will be available to testify on the subject of the non-existence of a handrail on the port towing knee at the time of the accident.

(3) Libellant requested the right of argument before findings were made, which the court agreed to.

(4) Libellant requests opportunity to submit additional testimony on the claim for maintenance and cure as to the time of disability, to prevent serious injustice to libellant.

The photograph which libellant discovered after the trial is merely an enlargement of respondent's exhibit "A", which was admitted in evidence at the trial and which disclosed the absence of a handrail on the port towing knee. Notwithstanding this exhibit, the court found from the testimony of the witnesses that at the time of the accident the knee was equipped with a handrail. There is no proof of the time when the picture was taken.

With regard to the libellant's request to argue the case before findings were made, on December 30, 1953, the court mailed to counsel for the libellant and respondents a letter which stated:

"Gentlemen:

Herewith are tentative findings of fact in the above cases.

If you desire to file briefs and have oral argument, kindly advise."

Counsel for the libellant did not reply to the letter and on January 19, 1954, counsel for the respondents advised by telephone that he did not desire to make further argument.

Furthermore, at the argument on the pending motions, the libellant was given the opportunity to make full argument on all issues of the case.

In order that a new trial be granted or a trial be re-opened to allow in new evidence, the evidence must in fact be newly discovered, that is, discovered since the trial. Facts must be alleged which disclose diligence on the part of the movant and the evidence must not be merely cumulative or impeaching. The evidence must be material to the issues involved and it must be of such nature as would probably result in an alteration of the decree of the court. In my opinion, the matters which libellant presents in his motion do not satisfy these requirements.

In his brief, libellant urges that notwithstanding the court's finding that libellant's injuries resulted solely from his own negligent act and not because of unseaworthiness of the vessel, nevertheless he is entitled to an award for pain and suffering which he endured as a result of the alleged failure of the master to promptly provide him with medical care. He argues, as we understand it, that such neglect is a form of unseaworthiness and not barred in this case by the statute of limitations. However, upon reconsideration of the evidence as to the nature of libellant's injuries, I make the following additional findings:

### Finding of Fact

25. During the period from the time of libellant's injury to the time he left the ship, the master did not breach any duty or obligation owed to libellant by respondents.

### Conclusion of Law

(6) Respondents are not liable to libellant for the pain and suffering which he endured as a result of the injuries which he sustained on May 28, 1945.

An order will be entered refusing the libellant's motions.